**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MARITZ HOLDINGS INC. and MARITZ MOTIVATION INC., <br><br> Plaintiffs, <br><br> v. <br><br> DREW CARTER, CHRIS DORNFELD JESSE WOLFERSBERGER, LAUREL NEWMAN, ANDREW HRDLICKA, BEN VALENTI, DANIEL CONWELL, and, WHISTLE SYSTEMS, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Case No. _____ |

## **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiffs Maritz Holdings Inc. and Maritz Motivation Inc. (collectively, "Maritz"), for their Complaint for Injunctive Relief and Damages against Defendants Drew Carter, Chris Dornfeld, Jesse Wolfersberger, Laurel Newman, Andrew Hrdlicka, Ben Valenti, Daniel Conwell (collectively, the "Individual Defendants"), and Whistle Systems, LLC, ("Whistle") (together with the Individual Defendants, the "Defendants"), hereby state as follows:

### INTRODUCTION

1. Maritz is a St. Louis-based sales and marketing company that designs and implements employee recognition and reward programs, group travel programs, customer loyalty programs, and channel sales incentive programs. Maritz also organizes and markets trade shows and other live events for its customers.

2. The Individual Defendants are former employees of Maritz. Each of the Individual Defendants executed a Confidentiality, Non-Competition, Non-Solicitation, and Inventions Agreement (the "Agreement") with Maritz, which contains certain post-employment restrictive covenant obligations, including: (1) a duty to safeguard Maritz's "Confidential Information" (as

defined in the Agreements) and to return all Maritz property and Confidential Information at the conclusion of their employment; (2) a covenant not to compete with Maritz for a period of 12 months following termination for any reason; (3) a covenant not to solicit, divert, provide competitive services for, or otherwise diminish Maritz's business relationship with certain of Maritz's customers, suppliers, vendors, or referral sources for a period of 12 months following termination for any reason; and (4) a covenant not to solicit Maritz's employees for a period of 12 months following termination for any reason.

3.      From approximately July 2020 through mid-August 2020, Maritz Motivation considered and discussed the possibility of "spinning off" a portion of its channel sales incentives business into a new company ("NewCo"). Under this proposal, Maritz would retain a stake in the newly-formed company while seeking other investors to join NewCo, which would operate as a separate, independent business from Maritz. Maritz's senior leadership team was actively involved in these discussions, and Maritz Motivation's then-president, Defendant Drew Carter, was considered to potentially lead NewCo after its creation. Several of the Individual Defendants were also considered as potential employees of NewCo.

4.      Carter and certain of the Individual Defendants, while remaining subject to the terms of the Agreements, continued to be provided with highly-sensitive, confidential, and strategic information in conjunction with Maritz's potential plans for NewCo.

5.      In mid-August 2020, Maritz decided not to move forward with its plans to spinoff NewCo. Instead, Maritz decided to continue serving Maritz Motivation's clients internally.

6.      Unbeknownst to Maritz, almost immediately after Maritz decided not to move forward with the creation of NewCo, Carter and certain of the Individual Defendants began plotting to start a competing company. In other words, Carter decided he was going to move

forward with an alternative version of NewCo to compete with Maritz Motivation, irrespective of whether Maritz approved of it or not.

7.      On or about August 20, 2020, Maritz terminated Carter for dishonesty related to his solicitation of Maritz employees and other disloyal behavior. Carter was previously scheduled to depart from the company on August 28, 2020, but his separation of employment was accelerated upon Maritz's discovery of Carter's misconduct.

8.      Following Carter's departure from Maritz, on or about October 29, 2020, in an apparent effort to mislead Maritz and cover his tracks with what would appear to be a lawful explanation for his subsequent behavior, Carter informed Maritz's Chairman and Chief Executive Officer, Steve Maritz, that he was planning to establish a company offering incentive ***payment systems*** services.  Such services would not have been competitive with the products and services offered by Maritz. As such, Maritz did not raise any objection to Carter moving forward with his stated plans.

9.      Carter's representations about his future business endeavors were false.  Instead, Carter and the other Individual Defendants formed a competing company, Whistle, which is virtually identical to the proposed NewCo and what Maritz Motivation did then and does today. Whistle's marketed offerings overlap almost entirely with the very services Maritz Motivation provides.  Whistle's website repeatedly boasts the Individual Defendants' years of experience in the incentive and channel sales space (experience they gained while employed by Maritz) and makes implied comparisons between Whistle and Maritz.   In other words, the Individual Defendants have taken Maritz Motivation's business and its vision for NewCo, rebranded it as their own, and are now marketing its services to the public as a competitor to the services offered by Maritz Motivation, in clear breach of their obligations under their Agreements.

10.     **None** of the Individual Defendants had any meaningful experience in the channel sales incentive industry prior to their work at Maritz. In other words, virtually all of the knowledge and information the Individual Defendants have acquired about this particular industry was acquired in their employment at Maritz.

11.     Moreover, entry into the niche channel sales incentive market would require the use of a pre-existing software platform, or a massive expenditure of time, money, and resources to develop one, in order to be competitive. It would be effectively impossible for a small startup company like Whistle to provide any of the data-driven, technology-focused services Whistle purports to offer without the Individual Defendants using Confidential Information and trade secrets they acquired while at Maritz. As such, the Individual Defendants have used or disclosed, or will inevitably use or disclose, Maritz's trade secrets in their employment at Whistle.

12.      Maritz now brings this action to enjoin the Individual Defendants from further violations of their Agreements and to protect against the inevitable dissemination and use of Maritz's trade secrets and Confidential Information.

## PARTIES, JURISDICTION, AND VENUE

13.     Maritz Holdings Inc. is a Missouri corporation with its principal place of business at 1375 N. Highway Drive, Fenton, MO 63099.

14.     Maritz Motivation Inc. is a Missouri corporation with its principal place of business at 1375 N. Highway Drive, Fenton, MO 63099.

15.     Whistle Systems LLC is a Missouri limited liability company with its registered agent at 120 S. Central Ave. Suite 160, St. Louis, MO 63105. Whistle's Articles of Organization does not list a principal place of business.

16.     Defendant Carter is an individual believed to reside at 6251 McPherson Ave., St. Louis MO 63130.

17.     Defendant Dornfeld is an individual believed to reside at 6318 Waterman Ave., St. Louis, MO 63130.

18.     Defendant Wolfersberger is an individual believed to reside at 52 Forest Crest Dr., Chesterfield, MO 63107.

19.     Defendant Newman is an individual believed to reside at 304 West Rose Hill Ave., Kirkwood, MO 63122.

20.     Defendant Hrdlicka is an individual believed to reside at 4803 Forder Oaks Ct., St. Louis, MO 63129.

21.     Defendant Valenti is an individual believed to reside at 3636 Oxford Ave., Maplewood, MO 63143.

22.     Defendant Conwell is an individual believed to reside at 8601 Glenwood Dr., St. Louis, MO 63126.

23.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, as this action raises claims under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*.

24.     Venue is proper in this Court as contracted by the parties in the Agreements, as well as under 28 U.S.C. § 1391(b)(1) and (b)(2), because the Defendants reside within this district and a substantial part of the events giving rise to the claim occurred within this district.

**FACTUAL BACKGROUND**

*Maritz's Business*

25.     Maritz has long been considered an industry leader in group travel, channel sales incentives, customer loyalty, and employee engagement. Maritz operates across the globe to

5

provide personalized e-commerce platforms, rewards collection, and engagement strategies that reinforce Maritz's customers' brands, shape behavior, and inspire loyalty.

26.     Maritz partners with customers to provide, among other things, employee recognition and reward programs, channel sales incentive programs, and customer loyalty programs. It also manages group travel, plans corporate trade shows, meetings, and events, and offers traditional market research services, such as customer satisfaction tracking and creation of product-launch campaigns.

27.     Organizationally, Maritz Holdings is the parent company to multiple subsidiaries providing loyalty and incentive programming and strategy in different forms and across multiple industries.

28.     Maritz Motivation is the Maritz subsidiary responsible for designing, marketing, selling, and implementing programs intended to cultivate customer loyalty, employee engagement, and increased sales – including channel sales incentive programing.  As the Defendants are well aware, Maritz's channel sales incentive programming is among the most lucrative aspects of Maritz's overall business.

29.     Prior to the termination of his employment, Carter was the President of Maritz Motivation. Whistle competes most directly with Maritz Motivation.

30.     Upon information and belief, the key area wherein Whistle competes with Maritz is in designing, selling, implementing, and/or consulting on channel sales incentive programs.

31.     A channel sales incentive program is a series of policies and programs implemented within a business to incentivize and encourage a wide range of desirable behaviors for its channel sales partners, including increasing sales volume, increasing relevant cross-sales desirable to the customer, obtaining and incorporating customer feedback, and driving other desirable behaviors.

32.     The success of Maritz's business in this area derives from (among other things) leveraging behavioral science and data science to effectively incentivize a target audience to act in a manner consistent with overarching customer goals in a wide range of industries.

33.     Maritz "designs programs that align with [customer's] business values to spark action" and "combine[s] deep experience with proven expertise and tailored programs to give our partners a competitive edge." Maritz employs its "team of strategists, scientists, creatives and collaborators" to design programs for its customers to boost employee experience, brand and channel loyalty, sales performance and other positive business outcomes.[1]

34.     Maritz utilizes "proprietary behavioral and data sciences" to "build smart programs and platforms that engage people worldwide."[2] Maritz gives its customers "a deeper understanding of human behavior, then help[s them] use that knowledge to make informed and impactful decisions."[3]

35.     The Maritz website explains that "[p]eople are naturally curious, social, complex and emotional. Our scientists tap into these characteristics – and more – to develop effective motivational strategies for your business. By driving behavior, we deliver results."[4]

36.     The Maritz website further explains: "Behavior science is so important to our business, we turn every Maritz Motivation employee into an expert. Our extensive library of applied science gives us the tools, techniques and thought-starting theories needed to craft impactful programs and experiences for you."[5]

---

[1] *See* www.maritzmotivation.com/
[2] *Id.*
[3] *See* www.maritzmotivation.com/expertise/data-science/
[4] *See* www.maritzmotivation.com/expertise/behavioral-science/
[5] *Id.*

37.     In addition to leveraging behavior science to better serve its customers, Maritz has invested deeply in implementing technology and data science to design better programs for its customers. This includes data mining, predictive modeling, machine learning, and other technology to "help evaluate business information and give [its customers] actionable insights."[6]

***Maritz's Confidential Information and Trade Secrets***

38.     Maritz does business in a highly-competitive industry. Any competitive edge is critical to securing and maintaining business.

39.     In the course of its business, Maritz develops, generates, and maintains substantial confidential and proprietary information, including trade secrets, which are crucial to maintaining this competitive edge over other entities not in possession of such information. This includes "Confidential Information," as that term is defined in the Agreements which includes, but is not limited to, information related to Maritz's: operations, personnel, business plans and strategies, pricing, pricing methodologies and profit margins, customers (including customer lists and customer data), suppliers, vendors, referral sources, research and development plans and activities, sales, marketing and business plans and strategies, inventions, concepts, ideas, designs and formulae, market research, computer software and programs (including object code and source code), and computer and database technologies, systems, structures and architectures (the "Confidential Information").

40.     Maritz's Confidential Information is not generally known to, or readily ascertainable through proper means by, individuals outside of Maritz.

41.     Maritz has invested considerable time, effort, and expense in establishing and developing its Confidential Information, and in developing valuable and extensive goodwill

---

[6] *See* www.maritzmotivation.com/expertise/data-science/

8

among its customers and in developing contacts and business relationships with its customers through use of its Confidential Information.

42.     Maritz devotes significant efforts and resources to protecting its Confidential Information and trade secrets from unauthorized possession, use, or disclosure. Among other safeguards, Maritz: (1) restricts access to such information to those employees with a need to know and use such information in the performance of their job duties; (2) uses password-protected computers, devices, and systems to store and safeguard its trade secrets and Confidential Information; (3) trains and instructs its employees regarding the proper use, handling, and storage of such information; and (4) requires employees to execute restrictive covenant agreements prohibiting unauthorized use or disclosure of its Confidential Information.

43.     With respect to its channel sales incentives offerings, Maritz has devoted many millions of dollars and countless hours of hard work to developing software solutions to better understand relevant data in order to optimize its customers' programs. Maritz's software allows the company to aggregate and analyze data on virtually every participant in its channel sales incentives programs. As a result of Maritz's comprehensive data warehouse and its ability to process, organize, and analyze this data, Maritz is able to study millions of transactions across disparate platforms, then use those insights to improve channel sales incentive programs for its customers.

44.     The design of Maritz's data warehouse (the "schema"), the source code for its software, and the compilation of data from its warehouse are all highly proprietary and confidential. Such information derives independent economic value from its secrecy and is not generally known to the public or to Maritz's competitors, and Maritz has taken reasonable

measures to maintain the secrecy of such information. This information therefore qualifies as protectable trade secrets.

45.     Further, in the regular course of its business, Maritz employs discreet software developed internally for the purpose of storing, managing, and analyzing specific types of customer data in order to manage incentive and recognition programs and respond to customer needs. This software is not generally known to the public or to Maritz's competitors and derives economic value from its secrecy, and Maritz has taken reasonable measures to maintain the secrecy of such information. This information likewise qualifies as protectable trade secrets.

46.     In addition, it is a significant competitive advantage in this industry to know executive-level information concerning a competitor's strategies for target markets and market segments, pricing tools, profitability and margins for clients and for products, technology solutions and tools, sourcing strategies, product and service offerings, and customer requirements—many of which are protectable trade secrets.  This is the exact kind of information gained by the Individual Defendants during their employment with Maritz.

*The Confidentiality, Non-Competition, Non-Solicitation and Inventions Agreements*

47.     In exchange for their employment with Maritz, each Individual Defendant agreed to the terms of the Agreement with Maritz.  Each of the Agreements was electronically signed in Maritz's Learning Management System module in conjunction with the Individual Employee's new hire paperwork. A true and accurate copy of the Agreement is attached hereto as **Exhibit A**.

48.     The Agreement is intended to protect Maritz's Confidential Information and trade secrets, customer relationships, company goodwill, and other protectable business interests.

49.     In the Agreement, each Individual Defendant acknowledged that in exchange for their promises, they were given access to Maritz's Confidential Information, defined in the

10

Agreement as "proprietary, trade secret, confidential, and other valuable information relating to its customers and business." (*Id.* at 1.)  This includes information related to Maritz's: "operations, personnel, business plans and strategies, pricing, pricing methodologies and profit margins, customers (including customer lists and customer data), suppliers, vendors, referral sources, research and development plans and activities, sales, marketing and business plans and strategies, inventions, concepts, ideas, designs and formulae, market research, computer software and programs (including object code and source code), and computer and database technologies, systems, structures and architectures." (*Id.* at ¶ 5.)

50.     Each Individual Defendant also acknowledged that this access to Maritz's Confidential Information, as well as valuable training and work assignments, were good and valuable consideration for the contract. (*Id.*)

51.     The Agreement provides that each Individual Defendant shall not compete with Maritz for a period of twelve (12) months following the termination of his or her employment for any reason:

> **You Will Not Compete Against Maritz.** During your employment with Maritz and for 12 months after such employment ends (for any reason whatsoever), you agree that you will not work on behalf of, or otherwise assist, any business that provides any goods or services that are the same or substantially similar to, or competitive with, the solutions, programs or services Maritz provided during the last 24 months before Employees separation of employment from Maritz. This restriction only applies to (i) businesses within the United States of America, and (ii) executive, managerial, supervisory, sales, marketing, research, operational, or customer related services provided for your own benefit, or to assist another business in competing, directly or indirectly (including assisting or having another person or entity do for me what I otherwise may not under this paragraph), against Maritz. Further, you agree that you will not accept or continue any business relationship (whether as an employee, independent contractor or otherwise) with any business in which there is a reasonable likelihood that you may use or disclose any Confidential Information.

(*Id.* at ¶ 2.)

11

52.     The Agreement further provides that each Individual Defendant shall not solicit Maritz's customers, suppliers, vendors, or referral sources for a period of twelve (12) months after termination of his or her employment for any reason:

> **You Will Not Solicit Maritz' Customers, Suppliers, Vendors, or Referral Sources.** During your employment with Maritz, and for 12 months after such employment ends (for any reason whatsoever), you agree not to solicit, divert, provide competitive services for, or otherwise take any action to diminish Maritz' business relationship with, any Maritz customer, supplier, vendor, or referral source that you had business contact with during the last 24 months of your employment with Maritz. You further agree not to take any of the above actions, either directly or indirectly, for your own benefit or for the benefit of another business.

(*Id.* at ¶ 3.)

53.     Additionally, the Agreement provides that each Individual Defendant shall not solicit Maritz's employees for a period of twelve (12) months after termination of his or her employment for any reason:

> **You Will Not Solicit Maritz' Employees.** During your employment with Maritz and for 12 months after such employment ends (for any reason whatsoever), you agree not to solicit or influence any Maritz employee to end his/her employment with Maritz (even if the employee being solicited initiates contact) or otherwise attempt to interfere with the employment relationship between Maritz and any Maritz employee, including the employee's duty of loyalty to Maritz. This means you cannot solicit or influence any of these employees to end his/her employment with Maritz, either directly or indirectly, for your own benefit or for the benefit of another business. For purposes of this paragraph, "Maritz employee" includes anyone who is employed by Maritz at the time of solicitation, or who was employed by Maritz within 90 days prior to any such solicitation."

(*Id.* at ¶ 4.)

54.     The Agreement also prohibits any Individual Defendant from disclosing Maritz's or Maritz client's Confidential Information, except as necessary and proper within the scope of his or her employment with Maritz. (*Id.* at ¶ 5.)  Each Individual Defendant also agreed to "return any and all Confidential Information, and client or other third party confidential information obtained through [his or her] employment with Maritz, to Maritz on or prior to the termination of your

employment (for any reason whatsoever) and not keep any copies (in whole or in part), notes, or other documentation of such information." (*Id.*)

55.     Each Individual Defendant acknowledged and agreed that "all ideas, inventions, discoveries, patents, patent applications . . . and the like, which are conceived, developed, discovered, learned and/or otherwise created by [him or her] . . . are and will continue to be the sole and exclusive property of Maritz" in the Agreement. (*Id.* at ¶ 6.)

56.     By way of remedy, the Agreement provides that Maritz shall be entitled to obtain "an injunction or other forms of equitable relief to prevent or terminate any violation of [Defendant's] promises or restrictions." (*Id.* at ¶ 8.)

57.     The Agreement further provides for the award of costs, including attorneys' fees, to Maritz if an Individual Defendant breaches, or threatens to breach, the Agreement. (*Id.* at ¶ 14.)

***The Individual Defendants' Employment and Access to Confidential Information***

58.     Each Individual Defendant worked for Maritz and had extensive access to Maritz's Confidential Information and trade secrets.

59.     Carter began working for Maritz on or about July 31, 2017. Carter worked as the President of Maritz Motivation.

60.     Dornfeld began working for Maritz on or about October 30, 2017. Dornfeld worked as the Chief Operating Officer of Maritz Motivation.

61.     Wolfersberger began working for Maritz on or about February 22, 2016. Wolfersberger worked as the Chief Data Officer and Senior Director – Decision Sciences of Maritz Motivation.

62.     Newman began working for Maritz on or about June 13, 2018. Newman worked as the Behavioral Science Director of Maritz Holdings.

63.    Hrdlicka began working for Maritz on or about August 28, 2017. Hrdlicka worked as the Director – Decision Sciences for Maritz Motivation.

64.    Valenti began working for Maritz on or about March 10, 2020. Valenti worked as Senior Decision Sciences Analyst for Maritz Motivation.

65.    Conwell began working for Maritz on or about May 26, 2020. Conwell worked as an Analyst – Developer I for Maritz Motivation.

66.    None of the Individual Defendants had any meaningful experience in the channel sales incentives industry prior to joining Maritz. In other words, virtually everything the Individual Defendants currently know about channel sales incentives, they learned at Maritz.

67.    The Individual Defendants—particularly Carter, Dornfeld, Wolfersberger, and Newman—had significant access to executive-level Confidential Information and trade secrets, including marketplace strategy, pricing and margin information, and customer requirements. For instance, while planning for NewCo, these individuals had near-daily virtual meetings discussing marketplace strategy, pricing, and strategic services to be offered such as consulting, decision sciences, and data storage and analysis, all of which were utilized by Maritz and could be implemented at NewCo. Further, as members of Maritz's executive leadership team, these individuals frequently participated in high-level meetings with Chairman and CEO Steve Maritz, Chief Financial Officer Rick Ramos, Chief Behavioral Officer Charlotte Blank, and Executive Vice President and General Counsel Steve Gallant, and thereby gained knowledge of Maritz's overall strategies, planned initiatives, potential expansions or partners, recruiting efforts, and other valuable information that Maritz took efforts to keep secret from the public and its competitors.

68.    Hrdlicka, Valenti, and Conwell were intimately involved with developing and maintaining Maritz's channel sales incentives software and databases. As such, each of them had

extensive access to Maritz's code repository, software program designs, database structure and architecture, and channel sales incentive databases. For instance, Hrdlicka, Valenti, and Conwell all utilized Maritz's internally-developed software on a daily basis by logging into Maritz's code repository, "checking out" the code on which he was working, and then checking the code back in when he was finished working on it. Further, each of these individuals worked frequently with Maritz's proprietary data warehouse, or "schema," in their roles in analyzing the data that was stored within the schema. These Individual Defendants' knowledge of Maritz's software and data warehouse would give them the ability to recreate much of this information for a competitor.

***The Individual Defendants Conspire to Establish a Competing Company and Solicit Maritz Customers and Employees in Violation of Their Agreements***

69.     In Summer 2020, Maritz began making tentative plans to establish a new Maritz subsidiary company, referred to internally as "NewCo."

70.     Maritz intended to staff NewCo with some of its leadership from Maritz Motivation, and entrust certain business handled by Maritz Motivation to NewCo.  The list of potential NewCo employees included Carter, Dornfeld, Wolfersberger, Hrdlicka, Newman, and Valenti—*i.e.*, all of the Individual Defendants except Conwell.

71.     Throughout the summer of 2020, Maritz leadership, Carter, and certain of the Individual Defendants met frequently to discuss launching NewCo, including discussions regarding NewCo's potential marketplace strategy and product and service offerings.

72.     Around this time, due to performance issues and a variety of economic factors, Maritz planned to lay off Carter effective as of August 28, 2020.

73.     On August 20, 2020, Maritz made the decision not to "spin off" NewCo.  Instead, Maritz decided that it would continue offering these products and services internally through Maritz Motivation, as it had done before.

74.     Maritz terminated Carter's employment for cause on August 20, 2020, upon discovering that Carter was secretly soliciting Maritz employees without Maritz's knowledge or consent (and has misrepresented his activities related to these efforts), as well as interfering with Maritz's employee and prospective customer relationships.

75.     Unbeknownst to Maritz, almost immediately after learning that Maritz would not proceed with the plans for NewCo, Carter moved forward to establish a new company which would compete directly with Maritz.   Carter began soliciting Maritz employees, including the other Individual Defendants, to found a company substantially similar to what was planned as NewCo, and which was designed to compete with Maritz (i.e., Whistle).

76.     By the end of 2020, less than four months after Carter's separation from Maritz, Defendants Dornfeld, Wolfersberger, Newman, Hrdlicka, Valenti, and Conwell all separated from Maritz.  Wolfersberger and Dornfeld were involuntarily separated as a part of a reduction in force, while Newman was temporarily furloughed. Newman was offered a position at Maritz to return from furlough, but declined it. Hrdlicka, Valenti, and Conwell voluntarily separated from Maritz, apparently for the purpose of joining Whistle.

***Maritz's Previous Efforts to Secure Carter's Compliance with his Contractual Obligations***

77.     On August 31, 2020, Maritz's Executive Vice President & General Counsel, Steve Gallant, sent a letter to Carter demanding that he cease and desist from further soliciting or interfering with Maritz customers, prospective customers, and employees in violation of his Agreement. A true and correct copy of this letter is attached hereto as **Exhibit B**.

78.     On September 15, 2020, Carter responded through counsel denying any violations of the Agreement and affirmatively stating that Carter's actions would not interfere with Maritz's current customer and employee relationships. A true and correct copy of this letter is attached hereto as **Exhibit C**.

16

79.   Maritz responded to Carter's letter on September 22, 2020, through counsel, pointing out deficiencies in Carter's explanations, requesting the return of his Maritz laptop (which had not yet been returned, in violation of the Agreement's "return of property" provision), and requesting certification that Carter would abide by all terms of his Agreement. A true and correct copy of this letter is attached hereto as **Exhibit D**.

80.   Maritz secured the return of Carter's company-issued devices on or about October 9, 2020, almost two months after Carter's separation of employment, but did not receive the requested written assurances.

81.   In October 2020, Carter approached Maritz's Chairman and Chief Executive Officer, Steve Maritz, to discuss his purported plans to start a new business. Carter represented to Mr. Maritz that he intended to start a new company solely in the ***payment systems*** space. Maritz does not offer any products or services in the payment systems space, so, based upon Carter's representations, Maritz did not consider this potential business endeavor as competitive with Maritz, and therefore did not raise objection to Carter's stated plans.

82.   Carter's representations to Mr. Maritz were false.

***The Defendants Move Forward to Establish a Company in Direct Competition with Maritz***

83.   Upon information and belief, unbeknownst to Maritz, Carter (with assistance and encouragement from the other Individual Defendants) registered their new company with the Missouri Secretary of State on September 23, 2020, with the registered name "Whistle Systems LLC."

84.   Whistle now has a publicly-accessible website at www.wewhistle.com.

85.   Contrary to Carter's prior representations, Whistle's business appears to have very little to do with payment systems.  Rather, according to Whistle's own website, the company

operates in the same channel sales incentives marketplace as Maritz Motivation, offering many of the same kinds of services.

86.     On the Whistle website, each Individual Defendant is identified as a member of the "Founding Team."

87.     According to its website, Whistle was created by a group of "industry leaders with decades of experience in the technology, applied sciences and incentive marketplace," and is "leveraging decades of experience in design, behavioral science and engineering" to "build[] a better way to communicate and process incentive payments, improving the ROI of your channel program."[7]

88.     The Individual Defendants acquired these supposed "decades of experience" in the "incentives marketplace" while working at Maritz, as none of them had any meaningful prior work experience in this niche industry prior to their time at Maritz.

89.     The Whistle website further states: "Psychology and behavior science inform our tech and drives behavior that leads to happier, more successful participants."[8] The Maritz website, meanwhile, explains that Maritz "[c]ombine[s] the science of human behavior with the art of motivation, and create experiences that make business – and lives – better."[9]

90.     The Whistle website describes the company's mission as follows: "Through a combination of behavioral science, technology, design, and data, Whistle is reinventing how we understand and think about the channel incentive marketplace."[10] The Maritz website, meanwhile, explains its approach to channel sales incentives programming: "Science and analytics are crucial

---

[7] *See* www.wewhistle.com/
[8] *Id.*
[9] *See* www.maritzmotivation.com/expertise/behavioral-science/
[10] *See* www.wewhistle.com/what-we-do/

to what we do, but it's more than crunching numbers. We collaborate with academic partners to apply behavioral and data science in new ways and deliver unparalleled results."[11]

91.     Specific to the channel incentives business, the Whistle website advertises how the company provides "[a] clear top down and bottom up look at the way your channel operates and the role incentives play (or don't play) in its performance."[12] The Maritz website advises visitors that the company "[p]artner[s] with our experts, and you can feel confident that your channel incentive strategy and program design will drive the results you want for your business."[13]

92.     Based on Whistle's description of its own services and capabilities in the channel sales incentive industry, it is inevitable that Whistle and the Individual Defendants have used (and/or will use) Maritz's Confidential Information and trade secrets, including but not limited to the design and architecture of its data warehouse, its software solutions, source code, and potentially customer data.

93.     Indeed, it would be virtually impossible for *any* company (much less a small startup like Whistle) to build a viable and competitive software solution from scratch in the niche channel sales incentive industry without spending many millions of dollars and innumerable hours in development. Unless Whistle is grossly mischaracterizing or overstating its services and capabilities, Whistle is using Maritz's trade secret information to compete.

***Maritz's Demands to Cease and Desist and to Provide Assurances***

94.     In or around late March 2021, Maritz first became aware of the existence of the Whistle website.

---

[11] *See* www.maritzmotivation.com/expertise/
[12] *See* www.wewhistle.com/what-we-do/
[13] *See* www.maritzmotivation.com/expertise/sales-performance/

95.     On April 6, 2021, Maritz sent letters to each of the Individual Defendants reminding them of their obligations under their Agreements, with Maritz requesting certification that each Individual Defendant had ceased any activity that breached his or her Agreement.

96.     In this letter, Maritz explicitly asked each Individual Defendant to certify that he or she was not in possession of any documents or communications containing Maritz's Confidential Information or trade secrets (or that of its customers), and requested that if the Individual Defendants are in possession of such information, to provide a detailed accounting.

97.     Maritz asked each Individual Defendant to certify that he or she had not solicited Maritz's customers, vendors, or employees in violation of their Agreements and would certify that he or she would not make any such solicitations for the duration of their obligations under the Agreements.

98.     Maritz also asked each Individual Defendant to certify that he or she was not competing (and will not compete) with Maritz.

99.     Maritz specifically asked Carter to de-activate the Whistle website at www.wewhistle.com.

100.    On April 14, 2021, counsel for the Individual Defendants responded to Maritz's cease and desist letters. In the letter, the Individual Defendants argue that Whistle is not a competitor of Maritz, despite the clear language on its website indicating otherwise.  In doing so, the letter mischaracterizes the scope and nature of Maritz's channel sales incentives business, as well as the services Whistle expressly describes on its website.

101.    The Defendants' April 14 letter makes the incredible contention that Whistle primarily intends "to serve as a payment processor for channel sales programs" and that any "references to the 'channel incentive marketplace' and phrases like 'behavioral science' and

'improving the performance of your channel' on Whistle's website are entirely appropriate and consistent with Whistle's hypothesis that quicker payments to participants in channel incentive programs will improve participant engagement, and ultimately, the performance of the channel."

102.    The Defendants' efforts to characterize Whistle as a "payments" company rings hollow and is entirely belied by Whistle's own website.  For example, Whistle's website explains:

> Our SaaS based platform is more advanced than any other incentive platform.  Our mobile app puts your program directly in the hands of your channel partners, opening a line of communication and real time updates for participants. Coupled with recognition, training, and payouts, our platform leads the bleeding edge of sales channel program management.

103.    By Whistle's own words, the company is offering an "incentive platform" to provide "sales channel program management"—i.e. precisely the kinds of products and services offered by Maritz Motivation.  Unless Whistle's website is mischaracterizing *the company's own products and services*, the company is clearly holding itself out as a participant in the channel incentive marketplace, and thus, is a direct competitor of Maritz.

104.    The Defendants' letter attempted to provide Maritz with the following "assurances" regarding their competitive activities:

(i)     Whistle is not offering the same products or services that Maritz is offering;

(ii)    Whistle is not providing (a) market research, (b) travel, meeting and event planning services, (c) employee incentives programs, (d) customer loyalty programs, or (e) serving as a rewards provider;

(iii)   Whistle has not solicited and is not working with any Maritz customers;

(iv)    . . . Whistle is willing to work with Maritz to come to a reasonable agreement to remove or redesign any perceived offending portions of Whistle's website.

105.    The Defendants' purported "assurances" are especially notable for what they do *not* include. Most glaringly, Whistle and the Individual Defendants have failed to provide *any* assurances that they are not in possession of Maritz's trade secrets or Confidential Information, as

21

explicitly requested by Maritz in its April 6 letter. In fact, throughout the Defendants' carefully-curated 6-page letter, the Defendants fail to make a single reference to "Confidential Information" or "trade secrets"—one of the primary concerns outlined in Maritz's April 6 letter.

106.   Whistle and the Individual Defendants also offer no assurances that they will not solicit Maritz's customers or employees in the future, and they make no assurances that they have not (or are not currently) soliciting Maritz's employees.

107.   Maritz will be irreparably harmed if the Defendants are allowed to continue competing, soliciting, and misappropriating Maritz's trade secrets and Confidential Information, in violation of their Agreements. For example:

    a.  Maritz has invested millions of dollars and many thousands of hours into developing, curating, and maintaining its software and data-analysis tools to best serve its customers.  The value of this proprietary information depends in large part upon its secrecy. If Whistle and the Individual Defendants are allowed to use or disclose this information, Maritz's valuable investment will be forever damaged.

    b.  Maritz's customers entrust the company with significant volumes of information on transactions and program participants. If these customers and potential customers perceive that Maritz is unable to protect their data, Maritz's goodwill and reputation will be harmed, and these companies will be far less likely to choose Maritz for their programming.

    c.  Customers are continually evaluating their business partners for channel sales solutions and incentives programming.  Such customers partner with companies who will give them a competitive edge. Whistle's platform is based upon improperly obtained and/or used information and trade secrets the Individual Defendants obtained from Maritz. Without Court intervention, Maritz customers and prospective customers may send their business to Whistle, unaware of the unlawful nature of the business.

    d.  If potential business or merger partners perceive that Maritz is unable to protect its Confidential Information and trade secrets, those partners may be less likely to choose Maritz as a partner for their hard-built business.

    e.  Maritz's relationships with its key executive employees are undermined significantly if executives or other key personnel are allowed to leave Maritz and immediately violate the post-employment obligations to which they agreed.

108.    As acknowledged by each Individual Defendant in their respective Agreements, Maritz is entitled to an injunction and/or other equitable relief to enjoin the Individual Defendants' unlawful behavior, as well as any monetary damages suffered by Maritz, as well as its costs and attorneys' fees in seeking these remedies.

**CAUSES OF ACTION**

**Count I**
**Breach of Contract**
**(All Individual Defendants)**

109.    Maritz incorporates by reference the foregoing allegations as though fully set forth herein.

110.    The Individual Defendants each entered into a valid contract supported by good and valuable consideration with Maritz. (Ex. A.)

111.    The Individual Defendants' Agreements preclude them from being employed in a business substantially similar to or competitive with the business of Maritz within twelve (12) months of their separation from Maritz for whatever reason. (Ex. A, ¶ 2.)

112.    The Individual Defendants began employment with a company that is competitive with the business of Maritz within twelve (12) months of his or her separation from Maritz.

113.    The Individual Defendants are all still employed with a company that is competitive with the business of Maritz.

114.    By working for a company competitive with Maritz, each Individual Defendant has violated the non-competition provisions of his or her Agreement with Maritz.

115.    Additionally, the Individual Defendants' Agreements preclude them from soliciting certain Maritz customers, suppliers, vendors, or referral sources within twelve (12) months of their separation from Maritz for whatever reason. (Ex. A, ¶ 3.)

23

116.    Upon information and belief, all Individual Defendants, through their work at Whistle, have solicited Maritz customers or will imminently solicit Maritz customers by offering and marketing competitive services.

117.    By soliciting Maritz customers in this way, each Individual Defendant has violated the non-solicitation provisions of his or her Agreement with Maritz.

118.    Additionally, the Individual Defendants' Agreements also preclude them, for a period of twelve (12) months from their separation of employment from Maritz for any reason, from soliciting Maritz employees to end such employee's employment with Maritz or to otherwise attempt to interfere with the employment relationship between Maritz and that Maritz employee. (Ex. A, ¶ 4.)

119.    Some or all of the Individual Defendants have solicited Maritz employees, and have hired them to Whistle, in violation of the obligations they owe to Maritz under their Agreements.

120.    By soliciting Maritz employees in this manner, each Individual Defendant has violated the employee non-solicitation provision of his or her Agreement with Maritz.

121.    Additionally, the Individual Defendants' Agreements preclude them from disclosing Maritz's Confidential Information, including but not limited to, information related to Maritz's operations, personnel, business plans and strategies, pricing, pricing methodologies and profit margins, customers, suppliers, vendors, referral sources, research and development plans and activities, sales, marketing and business plans and strategies, inventions, concepts, ideas, designs and formulae, market research, computer software and programs, and computer and database technologies, structures and architectures. (Ex. A, ¶ 5.)

122.    Through their work at Whistle, the Individual Defendant have retained, used, and/or disclosed, or will inevitably use or disclose, Maritz's Confidential Information.

24

123.     Upon information and belief, the Individual Defendants are in possession of tangible documents and communications containing Maritz's Confidential Information and trade secrets.

124.     As such, through their work for Whistle, each Individual Defendant has violated the non-disclosure obligations of his or her Agreement with Maritz.

125.     Maritz did not first materially breach the Agreements and has not excused the breaches by the Individual Defendants.

126.     As a direct and proximate result of the Individual Defendants' breaches, Maritz has been damaged and is entitled to injunctive relief and to recover all available damages, including compensatory and punitive damages, as well as attorneys' fees and costs.

**Count II**
**Trade Secret Misappropriation – Defend Trade Secrets Act**
**(All Defendants)**

127.     Maritz incorporates by reference the foregoing allegations as though fully set forth herein.

128.     In the course of its business, Maritz has developed, generated, collected, and maintained substantial volumes of trade secret information.

129.     This trade secret information includes, but is not limited to: the structure and capabilities of Maritz's data warehouse and programs; the source code for Maritz's software; the compilation of data maintained by Maritz related to its participants in its channel incentives programs; Maritz's pricing, margin, and profitability information for its clients and products; and proprietary information related to Maritz's technology solutions and tools. The Individual Defendants had access to such information by virtue of their employment at Maritz.

130.    Such information derives independent economic value from not being known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from the information's disclosure or use.

131.    As detailed herein, Maritz has taken reasonable steps to protect the secrecy of such information.

132.    Accordingly, this information constitutes protectable trade secrets under the DTSA, 18 U.S.C. § 1836, *et seq.*

133.    The Individual Defendants are all former employees of Maritz and are in possession of Maritz's trade secrets, in both tangible and intangible format.

134.    Upon information and belief, the Defendants are using and disclosing, or inevitably will use or disclose, Maritz's trade secrets on behalf of Whistle. In particular, by virtue of the Defendants' possession of Maritz's trade secret information, the Defendants will be able to: substantially recreate aspects of Maritz's data warehouse, software, and programs for use at Whistle; leverage Maritz's strategies and business plans (including those intended for use by NewCo); and undercut Maritz's pricing with respect to competitive products and services.

135.    Absent injunctive relief, Maritz will suffer irreparable harm which cannot be quantified in monetary terms, including harm to its: trade secrets, goodwill, and competitive edge; actual and prospective relationships with its merger and business partners; and relationships with its employees.

136.    As a direct and proximate result of Defendants' conduct, Maritz has been damaged and is entitled to injunctive relief and to recover all available damages, including compensatory and punitive damages, as well as attorneys' fees and costs.

**Count III**
**Trade Secret Misappropriation – Missouri Uniform Trade Secrets Act**
**(All Defendants)**

137.    Maritz incorporates by reference the foregoing allegations as though fully set forth herein.

138.    In the course of its business, Maritz has developed, generated, collected, and maintained substantial volumes of trade secret information.

139.    This trade secret information includes, but is not limited to: the structure and capabilities of Maritz's data warehouse and programs; the source code for Maritz's software; the compilation of data maintained by Maritz related to its participants in its channel incentives programs; Maritz's pricing, margin, and profitability information for its clients and products; and proprietary information related to Maritz's technology solutions and tools. The Individual Defendants had access to such information by virtue of their employment at Maritz.

140.    Such information derives independent economic value from not being known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from the information's disclosure or use.

141.    As detailed herein, Maritz has taken reasonable steps to protect the secrecy of such information.

142.    Accordingly, this information constitutes protectable trade secrets under the Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. § 417.450, *et seq.*

143.    The Individual Defendants are all former employees of Maritz and are in possession of Maritz's trade secrets, in both tangible and intangible format.

144.    Upon information and belief, the Defendants are using and disclosing, or inevitably will use or disclose, Maritz's trade secrets on behalf of Whistle. In particular, by virtue of the Defendants' possession of Maritz's trade secret information, the Defendants will be able to:

substantially recreate aspects of Maritz's data warehouse, software, and programs for use at Whistle; leverage Maritz's strategies and business plans (including those intended for use by NewCo); and undercut Maritz's pricing with respect to competitive products and services.

145.    Absent injunctive relief, Maritz will suffer irreparable harm absent monetary relief, including harm to its: trade secrets, goodwill, and competitive edge; actual and prospective relationships with its merger and business partners; and relationships with its employees.

146.    As a direct and proximate result of Defendants' conduct, Maritz has been damaged and is entitled to injunctive relief and to recover all available damages, including compensatory and punitive damages, as well as attorneys' fees and costs.

**Count IV**
**Breach of Fiduciary Duty/Duty of Loyalty**
**(Defendants Carter, Dornfeld, and Wolfersberger)**

147.    Maritz incorporates by reference the foregoing allegations as though fully set forth herein.

148.    As employees of Maritz, Carter, Dornfeld, and Wolfersberger all individually owed Maritz fiduciary duties, including a duty of undivided loyalty. These duties required them to refrain from usurping opportunities belonging to Maritz and to refrain from acting against Maritz's best interests.

149.    Upon learning that Maritz decided not to spin off NewCo, Carter, Dornfeld, and Wolfersberger moved forward with plans to usurp the business model and plans for NewCo.  To that end, Carter, Dornfeld, and Wolfersberger began soliciting and encouraging Maritz customers, prospective customers, and employees to sever and/or forego their relationships with Maritz.

150.    As a direct and proximate result of Defendants' conduct, Maritz has been damaged and is entitled to injunctive relief and to recover all available damages, including compensatory and punitive damages, as well as attorneys' fees and costs.

**Count V**
**Unjust Enrichment**
**(All Defendants)**

151.    Maritz incorporates by reference the foregoing allegations as though fully set forth herein.

152.    Through the actions alleged herein, the Defendants have been unjustly enriched and benefited by, among other things, the possession of Maritz's Confidential Information and trade secrets and profits from the use of such Confidential Information and trade secrets.

153.    It would be unjust to allow the Defendants to retain these benefits.

154.    As a matter of equity, the Defendants should be required to disgorge any and all benefits they have received, including but not limited to revenues, profits, commissions, and income resulting from the improper and unlawful conduct alleged herein and to reimburse Maritz in an amount equal to said unjust enrichment.

**Count VI**
**Tortious Interference with Contract**
**(All Defendants)**

155.    Maritz incorporates by reference the foregoing allegations as though fully set forth herein.

156.    Maritz has valuable and enforceable contractual commitments from many of its employees, including each of the Individual Defendants.

157.    Each of the Defendants has knowledge of these contracts and the obligations imposed by them.

158.    Each of the Defendants has intentionally induced, encouraged, and assisted the other Individual Defendants in their breaches of their Agreements.

159.    The Defendants have acted without justification for inducing said breaches.

160.     The Defendants' tortious conduct was willful, malicious, and done in conscious disregard of Maritz's contractual rights.

161.     As a direct and proximate result of the Defendants' conduct, Maritz has been damaged and is entitled to injunctive relief and to recover all available damages, including compensatory and punitive damages, as well as attorneys' fees and costs.

**Count VII**
**Preliminary and Permanent Injunction**
**(All Defendants)**

162.     Maritz incorporates by reference the foregoing allegations as though fully set forth herein.

163.     As a direct and proximate result of the Defendants' breaches, Maritz has suffered and will continue to suffer irreparable harm which cannot be quantified in monetary terms, including harm to its Confidential Information and trade secrets, market share, goodwill, standing in the industry, and in its relationships with its customers and employees, as well as the potential disclosure of its trade secrets, which cannot be quantified in monetary damages.

164.     Per the terms of the Agreements, Maritz is entitled to preliminary and permanent injunctive relief to prevent further breaches by the Defendants.

165.     Moreover, the DTSA and the MUTSA both authorize preliminary and permanent injunctive relief to prevent the actual or potential disclosure of trade secrets.

166.     Maritz will suffer immediate and irreparable harm if relief is denied which outweighs any harm to Defendants.

167.     The public interest will not be harmed if an injunction is granted. To the contrary, injunctive relief will serve the public interest by ensuring parties' contractual obligations are enforced and trade secret information is protected and preserved.

30

## PRAYER FOR RELIEF

WHEREFORE, Maritz respectfully requests the Court enter judgment in its favor and grant it the following relief:

A.      Entry of preliminary and permanent injunctive relief, for a period of twelve (12) months, restraining and prohibiting the Individual Defendants from directly or indirectly working on behalf of, or otherwise assisting, any business that provides goods or services that are the same or substantially similar to those provided by Maritz, including any work for any business that provides channel sales incentive programming or other incentive programming, including Whistle Systems LLC;

B.      Entry of preliminary and permanent injunctive relief, for a period of twelve (12) months, restraining and prohibiting the Individual Defendants from directly or indirectly soliciting any current Maritz employee to end his or her employment with Maritz or otherwise interfering in their employment with Maritz;

C.      Entry of preliminary and permanent injunctive relief, for a period of twelve (12) months, restraining and prohibiting all Defendants from directly or indirectly soliciting any customer with whom Maritz has done business during the twenty-four (24) month period prior to August 20, 2020;

D.      Entry of preliminary and permanent injunctive relief requiring all Defendants to:

    i.   Provide an accounting of all property, Confidential Information, and trade secrets belonging to or originating from Maritz in their possession, custody, or control at any time since their employment at Maritz ended;

    ii.  Return all property, Confidential Information, and trade secrets belonging to or originating from Maritz;

    iii. Permanently destroy all hard copies of the same, and to delete the same from all email accounts, computers, cell phones, storage devices, cloud storage accounts, networks, and any other electronic media or storage devise or account available to or accessible by them; and

31

      iv.  Provide independent verification of compliance with said injunction.

      E.     Award all available monetary damages, including but not limited to lost profits, compensatory damages, liquidated damages, punitive damages, costs, and attorneys' fees, as well as any pre- and post-judgment interest as allowed by law;

      F.     Disgorgement of any benefits, profits, or any other unjust enrichment improperly obtained by the Defendants;

      G.     All other relief the Court deems appropriate.

Respectfully submitted,

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*/s/ Gregg M. Lemley*
Gregg M. Lemley, MO #44464
Daniel P. O'Meara, PA #53535
    (pending admission *pro hac vice*)
Justin A. Allen, IN #3120449
    (pending admission *pro hac vice*)
Bradley W. Tharpe, MO #71203
7700 Bonhomme Ave, Suite 650
St. Louis, MO 63105
Tel: (314) 802-3935
Fax: (314) 802-3936
gregg.lemley@ogletree.com
dan.omeara@ogletree.com
justin.allen@ogletree.com
brad.tharpe@ogletree.com

***Attorneys for Plaintiffs***