# EXHIBIT 1

## Page 1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MISSOURI
 2                  EASTERN DIVISION
 3
 4
 5
 6
 7
 8
 9   MARITZ HOLDINGS INC. and MARITZ MOTIVATION INC.
                         vs.
10              DREW CARTER, et al.
11
12          Case No. 4:21-cv-00438
13
14
15
16
17
18
19
              *** ATTORNEYS' EYES ONLY ***
20
21
22
          DEPOSITION OF WILLIAM STEPHEN MARITZ
23
                   JUNE 17, 2021
24
25
```

## Page 2

```
 1            INDEX OF QUESTIONERS
 2   Questions by:              Page No.
 3   Mr. Wolf                   5
     Mr. Allen                  87
 4   Mr. Wolf                   90
 5
 6
 7
 8
 9            INDEX OF EXHIBITS
10   Exhibit No.    Description     Page marked
11
     Exhibit 17  Maritz 1502-1540         36
12
     Exhibit 18  **Attorneys' Eyes Only** - 51
13        MHI Board Meeting,
          Motivation Future Options
14
     Exhibit 19  Letter dated April 19,    62
15        2017
16   Exhibit 20  E-mails, Maritz 708       66
17   Exhibit 21  E-mails, Maritz 504       71
18   Exhibit 22  E-mails, DEF 1287         79
19   Exhibit 23  E-mails, DEF 892-893      81
20
21   (Original exhibits attached to original transcript.)
22
23
24
25
```

## Page 3

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF MISSOURI
 3                  EASTERN DIVISION
 4
     MARITZ HOLDINGS INC. and  )
 5   MARITZ MOTIVATION INC.,   )
                               )
 6         Plaintiffs,         )
       vs.                     )
 7                             )Case No. 4:21-cv-00438
     DREW CARTER, et al.,      )
 8                             )
            Defendants.        )
 9
10       DEPOSITION OF WITNESS, WILLIAM STEPHEN
11   MARITZ, produced, sworn, and examined on
12   June 17, 2021, at the offices of Ogletree, Deakins,
13   Nash, Smoak & Stewart, P.C., 7700 Bonhomme Avenue,
14   Suite 650, St. Louis, Missouri, before DeAnne M.
15   Renken, an RPR, CSR (IL), CCR (MO), and CCR (AR), in
16   a certain cause now pending in the United States
17   District Court, Eastern District of Missouri,
18   Eastern Division, wherein MARITZ HOLDINGS INC. and
19   MARITZ MOTIVATION INC. are the Plaintiffs, and DREW
20   CARTER, et al., are the Defendants.
21
22
23
24
25
```

## Page 4

```
 1             A P P E A R A N C E S
          For the Plaintiffs:
 2           OGLETREE, DEAKINS, NASH,
             SMOAK & STEWART, P.C.
 3        Mr. Justin A. Allen
          111 Monument Circle
 4        Suite 4600
          Indianapolis, Indiana  46204
 5        317-916-1300
          justin.allen@ogletree.com
 6        For the Defendants:
             HORWOOD MARCUS & BERK
 7        Mr. Richard Z. Wolf
          Mr. Matthew Barrett
 8        500 West Madison Street
 9        Suite 3700
10        Chicago, Illinois  60661
11        847-924-6228
12        rwolf@hmblaw.com
13        mbarrett@hmblaw.com
14        Also present:   Steve Gallant
15               Chris Dornfeld
16   Alaris Litigation Services
17   DeAnne M. Renken, RPR
18   Illinois CSR #084-004441
19   Missouri CCR #806
20   Arkansas CCR #828
21   711 North Eleventh Street
22   St. Louis, Missouri  63101
23   314-644-2191
24   1-800-DEPO
25
```

Page 9

1   Q. Sure.
2   A. Well, I guess it's to oversee the
3   operations and direction of the company.
4   Q. Do you distinguish between your role as
5   chairman and CEO at all?
6   A. No, not really.
7   Q. Does chairman refer to chairman of the
8   board?
9   A. Yes.
10  Q. Are there other board members of Maritz
11  Holdings, Inc.?
12  A. Yes, there are.
13  Q. Who are those members?
14  A. They are Jack Thomas, Christie Hicks,
15  John Schweig, Mike Flannery, Ted Maritz, and Willem
16  Maritz.
17  Q. Ted Maritz and Willem Maritz are
18  relatives of yours?
19  A. Yes.
20  Q. How are they related?
21  A. They are my sons, two of my sons.
22  Q. And does Jack Thomas have a position
23  with the company other than being on the board?
24  A. No.
25  Q. What about Christie Hicks? Does she

Page 10

1   have a position with the company?
2   A. No.
3   Q. And John Schweig?
4   A. No.
5   Q. Can you spell Schweig?
6   A. S-c-h-w-e-i-g.
7   Q. How long have you been CEO and chairman
8   of Maritz Holdings, Inc.?
9   A. I have been CEO since 1998, chairman
10  since 2001.
11  Q. I know that's a decent period of time,
12  but have your duties and responsibilities changed
13  over the years as CEO and chairman?
14  A. Not really. The things you deal with
15  is different.
16  Q. And prior to 1998, were you involved
17  with Maritz as a company?
18  A. Yes.
19  Q. What was your involvement?
20  A. Prior to 1990- -- well, I began my
21  career with Maritz in 1983. I was an account
22  executive in New Jersey. In 1985, I moved to
23  Detroit as an account executive still. 1990, I
24  moved to St. Louis as a VP of sales in a division
25  that no longer exists.

Page 11

1       In -- I became head of sales and
2   marketing for Motivation sometime in the mid '90s.
3   Q. That then takes us to becoming CEO in
4   1998?
5   A. Yeah.
6   Q. You said you became VP of sales in a
7   division that no longer exists. What was that
8   division?
9   A. It was called quality and productivity
10  division.
11  Q. What did that division do?
12  A. It ran employee engagement and
13  suggestion systems.
14  Q. Could you describe what that means?
15  A. Sure. Our signature product at the
16  time was called Idea System. Idea System was a
17  program that was sort of a super-charged suggestion
18  system that divided employees into teams,
19  cross-functioning teams, and had a system of
20  submission of ideas to groups that would evaluate
21  those ideas.
22      People could earn points and
23  merchandise, travel, whatever, for good ideas that
24  were primarily around cost savings or efficiency.
25  Q. When did Maritz exit that division?

Page 12

1   A. It would have been around 19- -- well,
2   I'm not sure that -- could you repeat the question?
3   Q. Sure. You mentioned that that quality
4   productivity division no longer exists.
5   A. Right.
6   Q. When did that division cease to exist?
7   A. Ah, that's a different question. It
8   ceased to exist probably around '93, '2 or '3 would
9   be my guess, somewhere in there.
10  Q. Did Maritz stop performing the services
11  that were part of that division entirely?
12  A. No.
13  Q. Did they become part of another
14  division?
15  A. Yes.
16  Q. Which division?
17  A. Motivation. Which they were already
18  part of. This was a division of Motivation.
19  Q. What is Maritz's business currently?
20  A. Well, we do quite a wide variety of
21  things. Would you like me to try to list them all?
22  Q. I would.
23  A. Okay. Let's see. We do registration
24  for events. We do housing for events. We do
25  logistics for events. We plan events. We design

Page 13

1  events.  We operate trade shows on behalf of our
2  clients.  We operate meetings of all sorts and
3  incentive travel.
4       We operate loyalty programs, incentive
5  programs, employee engagement programs.  We provide
6  rewards.  We do measurement, and training, and
7  communications, and administration of programs.
8       We do creative work.  We do analytics
9  of all sorts.  We have many subfunctions to that,
10  things like ingesting data and providing reports.
11  We consult.  That's a pretty good list of things we
12  do.  There may be more.
13       Q.  Sure.  Can we -- let's focus on Maritz
14  Motivation.  What is Maritz Motivation's business?
15       A.  Maritz Motivation's business is to run
16  programs for our clients.  Programs typically are
17  around employee engagement or employee readiness,
18  channel engagement, channel incentive, channel
19  motivation, loyalty programs, rewards, many of the
20  things that I listed before.  I had done -- you
21  know, data ingestion, the analytics, reporting.  All
22  those are things done by Motivation.
23       Q.  The data ingestion and reporting, can
24  you describe that in more detail with respect to
25  Maritz Motivation?

Page 14

1       A.  Sure.  In order to run a program, you
2  got to get data from customers, and that's referred
3  to as data ingestion.  And reporting is telling them
4  how their programs are operating, whatever else they
5  might be interested in.  We got report on
6  performance.
7       Q.  And the programs would be another
8  program that Maritz is running for that client; is
9  that right?
10       A.  I'm not sure I understand the question.
11       Q.  Well, what are the programs that you
12  would be reporting?
13       A.  We operate programs for our clients,
14  and reporting on those programs is something clients
15  are interested in and that we do and reporting
16  beyond those programs, their impact on, you know,
17  the balance of their business.
18       Q.  Could you describe what you mean by
19  that, "reporting on the balance of their business"?
20       A.  Well, it's impact -- if you're writing
21  a report on a sales incentive program and we have
22  insight into some other aspect of their marketing,
23  for example, you might talk about that to benefit
24  the client.
25       Q.  You mentioned channel incentives.  What

Page 15

1  did you mean by that?
2       A.  I meant precisely that, incentives for
3  the channel.
4       Q.  What do you mean by "channel"?
5       A.  Well, many businesses distribute their
6  products or services through channels, and so that's
7  what I referred to when I say channels, is the
8  channel -- like, car dealers are a channel for the
9  auto business, you know.
10       Stores -- many retail outlets are
11  channels for consumer goods manufacturers, and we
12  provide training and incentives and other services
13  in the channel to improve their performance.
14       Q.  Does every business have a channel?
15       A.  No.
16       Q.  Why not?
17       A.  Because some sell direct.  That would
18  probably be the primary.
19       Q.  So other than businesses that sell
20  direct, would any other business that's selling
21  goods have a channel?
22       MR. ALLEN:  Objection.  Vague.
23       A.  Yeah.  I don't think I can answer that
24  question.  I don't know.
25       Q.  (By Mr. Wolf)  Do -- strike that.

Page 16

1       Is there a particular kind of company
2  with which Maritz Motivation typically works?
3       A.  We don't -- well, could you repeat the
4  question?
5       Q.  Sure.  Is there a particular kind of
6  company that Maritz Motivation typically works?
7       A.  I don't understand typical -- what do
8  you mean by typical --
9       Q.  Is there a particular size of company
10  with which Maritz Motivation usually works?
11       A.  We prefer larger.
12       Q.  Why is that?
13       A.  Because they have more money to spend.
14       Q.  Is that the only reason?
15       A.  Usually.
16       Q.  Is there a particular industry that
17  clients operate in that Maritz prefers to work?
18       A.  We operate in many industries.
19       Q.  Which ones?
20       A.  Well, consumer goods, pharmaceuticals,
21  automotive, insurance, financial services,
22  transportation, hospitality, technology, services.
23       That may not be a complete list, but
24  that's at least a partial list.
25       Q.  I want to go back to the concept of

Page 25

1   Q. Does that include Maritz Motivation?
2   A. Yeah.
3   Q. What specific positions?
4   A. I don't know.
5   Q. Do you know a general sense of the
6   roles of the people that have been hired?
7   A. Probably across the board. I don't
8   know.
9   Q. Are you familiar with the term "NewCo"
10  as it relates to Maritz?
11  A. Yeah.
12  Q. And do you have -- well, what does that
13  mean, NewCo?
14  A. NewCo is a common business term for
15  a -- short for new company. That's typically
16  applied when you don't yet have a name or a plan or
17  you're thinking about it and it's -- can be referred
18  to as "NewCo."
19  Q. Was Maritz Motivation using the term
20  "NewCo" in and around summer of 2020?
21  A. Who is Maritz Motivation?
22  Q. The company, Maritz Motivation.
23  A. I don't think the company was using the
24  term. No.
25  Q. Were people at the company using the

Page 26

1   term?
2   A. Probably not many in Motivation, but
3   some.
4   Q. Did you have an understanding of how
5   that term was being used by those people?
6   A. Yep.
7   Q. How did you understand it to be used?
8   A. We had a -- we had a germ of a plan, an
9   idea I guess I would call it, for our own NewCo
10  involving the fundamentals of the digital
11  transformation, which we had been undertaking.
12  Q. And when you say "digital
13  transformation that we had been undertaking," is
14  that a digital transformation of Maritz Motivation?
15  A. Yes.
16  Q. And what kind of digital transformation
17  was Maritz Motivation undergoing?
18  A. Well, it was to build -- I'm sure you
19  have heard the term BIE, and it was -- the effort,
20  as any digital transformation is -- when we have
21  undergone digital transformations, our strategy has
22  been to cannibalize our own business, build our own
23  competitor so that we could then migrate clients to
24  a newer set of technology, and so that's what NewCo
25  was.

Page 27

1   Q. You mentioned, maybe, that only some
2   people were using the term NewCo. Was there a term
3   that you used in your mind for this -- for NewCo?
4   A. I used "NewCo."
5   Q. You did. Okay.
6   A. When you say "Motivation," I don't--
7   not everybody in Motivation was talking about NewCo.
8   Q. I understand. Okay.
9   Who were involved in the discussions
10  around potentially forming NewCo into an actual
11  entity?
12  A. The -- some members of the management
13  team at Motivation. Myself and the senior
14  management of Maritz broadly and the board.
15  Q. And who was the senior management that
16  was involved?
17  A. Steve Gallant, Rick Ramos, Jeff
18  Kellstrom, and David Peckinpaugh were all part of
19  it, and Drew Carter of course.
20  Q. And were there other Maritz Motivation
21  employees who were involved in the discussions?
22  A. I'm sure there were. I know there
23  were. I'm sure there were. I don't know all of
24  them.
25  Q. Were there specific products and

Page 28

1   services that were being considered to move to
2   NewCo?
3   A. At various times, we were debating and
4   considering many different options throughout that
5   period.
6   Q. Do you recall what those options were?
7   A. Probably not all of them. No.
8   Q. As you sit here today, do you recall
9   what some of the options were to transfer
10  business -- products and services to NewCo?
11  A. Yes.
12  Q. What were they?
13  A. Well, it was fundamentally BIE; so the
14  technology design to cannibalize us. And at
15  different times we talked about moving clients into
16  that business to support it financially, and we were
17  considering a wide range of options at that point,
18  because the pandemic was presenting us with what
19  appeared to be an existential threat.
20  Q. Of those options, was there anything
21  that was settled on?
22  A. What do you mean by "settled on"?
23  Q. Well, was there ever a decision that if
24  NewCo was formed, it will look like this?
25  A. It never reached the stage of any final

Page 29

1  form. No.
2  Q. So at the -- we will get to why it
3  didn't materialize; but at the time -- well, strike
4  that.
5  At some point did Maritz Motivation
6  decide not to move forward with NewCo?
7  A. Yes.
8  Q. And at that time, had any plan
9  materialized as to the products and services that
10  NewCo would have been provided -- would have been
11  providing?
12  A. There was no final plan.
13  Q. Was NewCo going to have its own
14  employees?
15  A. Yes.
16  Q. Where would those employees be hired
17  from?
18  A. The initial group were to come from
19  Maritz.
20  Q. From Maritz Motivation?
21  A. Yes.
22  Q. Were there going to be outside
23  employees as well?
24  A. Probably eventually.
25  Q. The employees that NewCo was going to

Page 30

1  hire from Maritz Motivation, would those employees
2  be terminated from Maritz Motivation?
3  A. If they had gone to work for NewCo?
4  Q. Yes.
5  A. Well, you're asking me to speculate.
6  But I would think so. Yeah.
7  Q. In other words, the plan was -- they
8  would only have one employer. If employees were to
9  go over, they would go to NewCo and cease to be
10  employees of Maritz Motivation; is that fair?
11  A. Repeat it for me. Will you, please?
12  Q. Sure. If NewCo had hired employees
13  from Maritz Motivation, those employees would not
14  have remained employees of Maritz Motivation.
15  A. Presumably.
16  Q. Was NewCo going to utilize the Maritz
17  name?
18  A. We hadn't gotten that far.
19  Q. Do you know who was going to own NewCo?
20  A. Well, Maritz.
21  Q. When you say "Maritz," what do you
22  mean?
23  A. I mean Maritz Holdings.
24  Q. Are you certain? Had that been
25  finalized?

Page 31

1  A. No. I told you nothing had been
2  finalized.
3  Q. But the general plan was that a Maritz
4  company would have an ownership interest in NewCo.
5  A. Yes.
6  Q. Were there going to be other owners of
7  NewCo?
8  A. Nothing -- there were no plans.
9  Q. There were no plans to seek outside
10  funding for NewCo?
11  A. There was conversations about it, but I
12  had instructed Drew not to do that.
13  Q. Why is that?
14  A. Because we weren't prepared, and we had
15  not decided we were going to do it.
16  Q. So what, ultimately, happened to NewCo
17  or the idea of NewCo?
18  A. Excuse me?
19  Q. What ultimately happened to NewCo?
20  A. We didn't do it.
21  Q. Why not?
22  A. Because, as I said, we were facing what
23  I felt was an existential threat from the pandemic,
24  and the cost and risk of doing so at that point in
25  time was too great.

Page 32

1  Q. Who made the decision not to move
2  forward with NewCo?
3  A. I did.
4  Q. Was there anyone else involved in that
5  decision?
6  A. Oh, yeah.
7  Q. Who was that?
8  A. Well, all the people who had discussed
9  NewCo. So Drew Carter, David Peckinpaugh, Jeff
10  Kellstrom, Steve Gallant, Rick Ramos, the board,
11  Mike Flannery, Jack Thomas, John Schweig, Christie
12  Hicks, Ted Maritz, Willem Maritz.
13  They were all part of the discussions
14  that ultimately -- you know, everybody had part of
15  it. I, ultimately, made the decision.
16  Q. Was there -- strike that.
17  Was there a point in time where you
18  were -- you were, personally, in favor of moving
19  forward with NewCo?
20  A. At a point in time, yes.
21  Q. And what changed?
22  A. Well, the -- a number of things, but
23  probably chief among them was the threat -- the
24  nature of the threat to our MGE business that I
25  considered potentially existential continued, and

8 (Pages 29 to 32)

Page 53

```
 1        Q.  I will represent to you that this was
 2   produced by Maritz in the case.  There is a Bates
 3   number, Maritz 1310.  This came from Maritz's files
 4   and records.
 5        A.  Okay.
 6        Q.  Do you recall an MHI board meeting on
 7   or about August 5, 2020?
 8        A.  We would have had one then.  Yeah.
 9        Q.  Do you specifically recall a MHI board
10   meeting around that time period where Motivation
11   future options was discussed?
12        A.  Yeah.  I mean, I'm sure we did.  Yeah.
13        Q.  What do you recall -- what do you
14   recall from that meeting?
15        A.  Not much.
16        Q.  Do you recall whether there was a
17   specific meeting to talk solely about Motivation
18   future options?
19        A.  I do not.
20        Q.  Turn to the first page -- well, sorry.
21   The second page after the title page.  It's Maritz
22   1311 at the bottom.
23        A.  Maritz 1311.  Okay.
24        Q.  Do you recall seeing this document?
25        A.  No, not really.
```

Page 54

```
 1        Q.  Do you recall discussions, for example,
 2   about client relationships having a zero percent
 3   priority waiting?
 4        A.  No.
 5        Q.  Do you recall discussions about any of
 6   the topics listed on this page?
 7        A.  We had discussions about all these
 8   topics.
 9        Q.  What do you recall from that?
10        A.  Well, I don't recall that we went down
11   point by point.  Rather, this is a proposed
12   framework about how to think about it.
13        Q.  Do you know who prepared this proposed
14   framework?
15        A.  No.
16        Q.  Turn to the next page.  It's Maritz
17   1312 at the bottom.
18        A.  Okay.
19        Q.  Do you see there is four options
20   presented here?
21        A.  I do.
22        Q.  There is Option 0, Option 2, Option 3,
23   Option 1.
24        A.  Right.
25        Q.  Do you see that?
```

Page 55

```
 1        A.  I do.
 2        Q.  Do you recall discussion about these
 3   four options at a board meeting?
 4        A.  Mind if I take a minute and read them?
 5        Q.  Of course.
 6        A.  Okay.  Yeah.
 7        Q.  Do you recall a discussion at a board
 8   meeting about these four options?
 9        A.  I'm sure it happened.  Yeah.  I mean,
10   we were having lots of discussions about the
11   options.  These four, plus whatever else might have
12   been on people's minds would have been what we
13   discussed.
14        Q.  Do you recall a discussion just about
15   these four options listed on this page specifically?
16        A.  I'm having a little trouble answering
17   your question, because it seems you are asking:  Was
18   it limited to just these four?  Is that the nature
19   of your question?
20        Q.  No.  I'm just wondering if you recall a
21   conversation at a board meeting in August 2020 about
22   the four options presented here?
23        A.  Plus everything else.  Yes.
24        Q.  Okay.
25        A.  Clearly.  This is what we were talking
```

Page 56

```
 1   about.
 2        Q.  What was the nature of the
 3   conversation?  What do you recall being discussed?
 4        A.  We were discussing about the best way
 5   forward under the circumstances.
 6        Q.  And the circumstances were the COVID
 7   pandemic?
 8        A.  Well, yeah.  COVID pandemic, plus, you
 9   know, financial performance, our position in the
10   industry, the nature of our -- you know, you have to
11   consider all aspects before making a decision.
12        Q.  And of the four options that are listed
13   here, was one of these options decided upon to move
14   forward with?
15        A.  Probably closest to 2.
16        Q.  Closest to 2 but not necessarily 2
17   itself?
18        A.  You know, these are pretty broad, and
19   so -- you know, what we ultimately determined was --
20   does kind of look like 2.  Yeah.  We didn't
21   necessarily refer to it as 2.
22        Q.  How do you describe what the board
23   ultimately determined to do at this meeting?
24        A.  I don't think anything was determined
25   at that meeting as a final course of action.
```

Page 57

1   Q.  Was there a recommended course of
2   action that arose out of that meeting?
3   A.  No.  It was pretty controversial.
4   Q.  Why do you say that?
5   A.  Because it was.
6   Q.  What was controversial?
7   A.  Different people had different
8   opinions.
9   Q.  What was your opinion?
10  A.  I was trying to listen to it all, but
11  at the time, on August 5, I was still kind of
12  enamored with the NewCo concept.
13  Q.  You say "enamored" meaning you wanted
14  to move forward with it?
15  A.  I hadn't decided that.  No.  But I was
16  intrigued and thought it sounded good and wanted to
17  explore it.
18  Q.  And why do you recall wanting to
19  explore it at that time?
20  A.  Well, because we invested so much money
21  and time and effort into this digital
22  transformation, and we were very close to launching,
23  and so I was reluctant to not do that.
24  Q.  Turn to page -- it's 6 of the deck,
25  Maritz 1315.

Page 58

1   A.  Yep.
2   Q.  At the top it says "A tech spin-out."
3   Do you see that?
4   A.  Yep.
5   Q.  Is that referring to NewCo?
6   A.  Yes.
7   Q.  So there was -- NewCo was still a topic
8   of discussion at this board meeting --
9   A.  Yes.
10  Q.  -- correct?
11  A.  Yes.
12  Q.  Turn to page 9 of the deck.  It's
13  Maritz 1318.
14  A.  Yes.
15  Q.  At the top, you see it says "Our
16  platform is well positioned in the market."
17  A.  Yep.
18  Q.  Do you know what platform that refers
19  to?
20  A.  BIE.
21  Q.  Just BIE?
22  A.  In terms of the platform, yes.  Well, I
23  guess.  I don't know.  I don't know who wrote it, so
24  I don't know exactly, but I would think so.
25  Q.  And if you look, there is a number of

Page 59

1   companies listed here.
2   A.  Uh-huh.
3   Q.  Other companies.  Do you see that?
4   A.  Uh-huh.
5   Q.  Are these Maritz's competitors?
6   A.  Some of them.
7   Q.  Which ones?
8   A.  All of them.
9   Q.  Are these Maritz's main competitors?
10  A.  Depends on the industry.  Depends on
11  what the product is, but this would be the main
12  competitors in the -- in the two -- what BIE and
13  what Motivation is.  Yeah.
14  Q.  You can put that aside.
15      Were you involved in the decision to
16  hire Drew Carter?
17  A.  Yes, I was.
18  Q.  What was your involvement in that
19  decision?
20  A.  I was the one that hired him.
21  Q.  And why did you decide to hire
22  Mr. Carter?
23  A.  Well, he had experience, because he had
24  been consulting on the business, and I liked him and
25  thought he had the right skill set for the digital

Page 60

1   transformation that was required.
2   Q.  When you say he was consulting on the
3   business, what do you mean by that?
4   A.  We had hired Alix Partners to consult
5   about the business, and he was, I think, the lead on
6   that project.
7   Q.  Was there a particular aspect of the
8   business that Alix Partners was consulting on?
9   A.  No.  I think it had to do with the
10  entirety of the business.
11  Q.  Was that the entirety of the Maritz
12  Motivation business or...
13  A.  Yes.
14  Q.  Okay.  Was Mr. Carter replacing someone
15  at Maritz?
16  A.  Yeah.  I'm sure.
17  Q.  Do you recall who?
18  A.  Who was in charge at the time?  I guess
19  that was John McArthur.
20      THE WITNESS:  Is that right?  I think.
21  Q.  (By Mr. Wolf)  You said John...
22  A.  John McArthur.
23  Q.  McArthur.  What was Mr. Carter's title
24  when he was hired?
25  A.  President of Motivation.

Page 77

1  Q. And I know -- you're talking about
2  enforcing it with respect to this e-mail; correct?
3  A. I'm talking about the payroll
4  department would -- or under -- they don't issue the
5  checks unless people have signed them. So, you
6  know, we manage it by exception.
7  Q. Through the payroll department.
8  A. I think so.
9  Q. Who made the decision to terminate
10 Mr. Carter's employment with Maritz?
11 A. I did.
12 Q. And why did you decide to terminate
13 Mr. Carter's employment?
14 A. Well, he and the management team, who
15 were all let go at the time, were hired for the
16 purpose of the digital transformation; and when we
17 decided to mothball that, I made the decision that
18 the nature of their leadership was not appropriate
19 for the job required ahead of us.
20 Q. And why was that?
21 A. Because they were hired to do this
22 specific digital transformation, and we decided to
23 mothball that.
24 Q. I take it, then, Mr. Carter was not
25 replaced as president of Maritz Motivation?

Page 78

1  A. We currently have two co-presidents of
2  Motivation.
3  Q. Who are those?
4  A. Steve Gallant and Rick Ramos.
5  Q. Did Mr. Gallant and Mr. Ramos's
6  responsibilities change after Mr. Carter was
7  terminated?
8  A. Yes.
9  Q. How so?
10 A. They took on the co-presidents job at
11 Motivation.
12 Q. Do you believe Mr. Carter -- strike
13 that.
14     Do you believe you terminated
15 Mr. Carter for cause?
16 A. Can you define -- I think that's a
17 legal term. So I'm a little concerned about my
18 answer there. Can you define what that means, more
19 specifically?
20 Q. Well, as you -- you testified that you
21 made the decision to terminate Mr. Carter.
22 A. That's correct.
23 Q. Do you believe that was for cause in
24 your mind?
25     MR. ALLEN: Object. It calls for a

Page 79

1  legal conclusion.
2  A. Yeah. I don't know what that means.
3  Q. (By Mr. Wolf) What does it mean to
4  you?
5  A. That's why I'm asking you. You asked
6  the question. I don't know what it means.
7  Q. What does "cause" mean to you?
8  A. "Cause" is a term of -- let's see.
9  "Cause" means -- something is caused, that means an
10 action has a reaction, and that was causal. It's --
11 definition of cause. To cause is to make something
12 happen, I guess.
13 Q. Do you believe you terminated
14 Mr. Carter for any kind of misconduct?
15 A. Well, no.
16     (Exhibit 22, E-mails, DEF 1287, was
17 marked for identification.)
18 Q. (By Mr. Wolf) Okay. Mr. Maritz, you
19 have in front of you what's been marked as
20 Defendant's Exhibit 22.
21 A. Yep.
22 Q. Is that in front of you?
23 A. Yep.
24 Q. And you see it starts with an e-mail
25 from Drew Carter to yourself on Monday, August 24,

Page 80

1  2020. Do you see that?
2  A. Yes.
3  Q. And Mr. Carter starts off by saying
4  "Steve, I sure am disappointed that I won't be able
5  to lead Motivation into the promising future that
6  lay before it." Correct?
7  A. Yep.
8  Q. So this appears to be after Mr. Carter
9  was informed of his termination?
10 A. Yep.
11 Q. And you respond and said "I'm
12 disappointed too." Do you see that?
13 A. Yes.
14 Q. You say "To be right on the verge like
15 that just seems so arbitrary and unfair."
16 A. Unfair --
17 Q. I'm sorry. ..."so unfair and
18 arbitrary."
19 A. Uh-huh.
20 Q. What were you referring to being on the
21 verge?
22 A. We were about a week away from
23 launching our first client on BIE.
24 Q. The second line says "Thank you for
25 calling Galderma. I hope that helps."

20 (Pages 77 to 80)

### Page 81

1   A. Uh-huh.
2   Q. What did you mean by that?
3   A. Galderma is a client of ours, and I had
4   asked him to call Galderma to give them the news,
5   because he had a relationship with them.
6   Q. What was the news?
7   A. That he was departing.
8   Q. And do you believe that call did help
9   the relationship with Galderma?
10  A. I don't know.
11  Q. Do you believe it hurt the relationship
12  that Maritz Motivation had with Galderma?
13  A. I don't know.
14  Q. And then you said "I am really sorry
15  for it to end like this. If I can be of help to
16  you, please let me know."
17  A. Yep.
18      (Exhibit 23, E-mails, DEF 892-893,
19  was marked for identification.)
20  Q. (By Mr. Wolf) Mr. Maritz, you should
21  have in front of you what's been marked as
22  Defendant's Exhibit 23.
23  A. Yep.
24  Q. Do you have that?
25  A. I do.

### Page 82

1   Q. It starts with an e-mail from
2   Mr. Carter to yourself on Tuesday, November 3, 2020.
3   A. I see that.
4   Q. Subject line is "Good catching up."
5   A. I see that. Yep.
6   Q. The first line says "Steve, thanks for
7   making the time to connect with me last week."
8       Do you see that?
9   A. I do.
10  Q. Do you recall connecting with Drew
11  Carter the week prior?
12  A. I do.
13  Q. And did you meet in person?
14  A. I did.
15  Q. Where did you meet?
16  A. At Herby's in Clayton.
17  Q. And who was present?
18  A. Just the two of us.
19  Q. What did the two of you discuss?
20  A. He told me he was starting a payment
21  systems business that would not be competitive with
22  us. I wished him good luck.
23  Q. Anything else?
24  A. That was pretty much it.
25  Q. How long did you meet for?

### Page 83

1   A. Not long. Maybe half an hour.
2   Q. And do you recall discussing anything
3   else with Mr. Carter, other than the payment systems
4   business?
5   A. State of the world.
6   Q. Catching up?
7   A. Yeah.
8   Q. Would you characterize it as a friendly
9   meeting?
10  A. Yes.
11  Q. And in the second paragraph of the
12  e-mail, it says "As I mentioned, I'm starting a new
13  software/financial technology company."
14      Do you see that?
15  A. Uh-huh.
16  Q. It says "Chris Dornfeld, Laurel Newman,
17  and Jesse Wolfersberger asked to join, so we've
18  teamed up."
19  A. Yeah.
20  Q. Do you see that?
21  A. Uh-huh.
22  Q. And it says "We are tackling the
23  financial payment processes for incentive program
24  payments."
25      Do you see that?

### Page 84

1   A. I do.
2   Q. Is that what you were referring to
3   previously?
4   A. Yep.
5   Q. And did you have an understanding of
6   what that meant?
7   A. Yes.
8   Q. What? What is that understanding?
9   A. Well, I know what payment systems
10  businesses are, because we started one and owned
11  one, and it's a -- it's an important part of the
12  chain of services that we use in programs, and so
13  the idea that he could come up with a better
14  mousetrap was good and one that we could potentially
15  partner up with and use as a customer.
16  Q. You believe it was competitive to
17  Maritz at all?
18  A. Not if it's just a payment systems
19  business. No.
20  Q. Even if it's payment systems for
21  incentive program payments?
22  A. We use payment systems for incentive
23  programs.
24  Q. But it's not competitive with something
25  that Maritz provides.

Page 85

1  A.  The payment system alone is not.  No.
2  Q.  Does Maritz utilize an outside payment
3  system?
4  A.  Yeah.
5  Q.  And who is that?
6  A.  We have probably a few of them, but
7  Blackhawk, and certainly we use the ACH system.  So
8  credit cards.  You know, we accept credit card
9  payments, and so there is a variety of payment
10  systems that we utilize.
11  Q.  In the last paragraph of Mr. Carter's
12  e-mail, see where it says "I also want to steer
13  clear of anything that might cause me to get
14  sideways with you or anyone else at Maritz."
15      Do you see that?
16  A.  I see that.
17  Q.  Did you discuss that with Mr. Carter at
18  your meeting?
19  A.  Yeah.
20  Q.  What do you recall being discussed?
21  A.  Told him that as long as it wasn't
22  competitive, it was fine.
23  Q.  Did you believe Mr. Carter when he
24  said, in this e-mail, "I also want to steer clear of
25  anything that might cause me to get sideways with

Page 86

1  Maritz"?
2  A.  I believed him at the time.
3  Q.  Do you believe him as you sit here now?
4  A.  No.
5  Q.  Why is that?
6  A.  Because I saw what came out of Whistle.
7  Q.  What do you mean "what came out of
8  Whistle"?
9  A.  I have seen the Whistle website.  I
10  have seen what they claim to do, and it's directly
11  competitive, and it's way more than a payment
12  system.  In fact, payment system is a minor part of
13  it, it appears, if at all.
14  Q.  When you said "what came out of
15  Whistle," were you referring to anything else other
16  than the website?
17  A.  That's all I really have seen.
18  Q.  And you responded on November 12.  Do
19  you see that?
20  A.  Yep.
21  Q.  And you said "It was good to see you.
22  I let Steve know about these activities."
23      Do you see that?
24  A.  Yes.
25  Q.  Is that "Steve" referring to

Page 87

1  Mr. Gallant?
2  A.  Yes.
3  Q.  You said "I don't foresee any
4  problems."  Do you see that?
5  A.  Yes.
6  Q.  What were you referring to there?
7  A.  I was referring to his line that you
8  just mentioned down below, where he says "I also
9  want to steer clear of anything that might cause me
10  to get sideways with you or anyone else at Maritz."
11      That's what I was referring to.
12  Q.  You say "Good luck and stay in touch."
13  A.  Yeah.
14  Q.  Have you spoken to Mr. Carter since
15  your e-mail on November 12, 2020?
16  A.  I have not spoken to him, I don't
17  think.  No.
18      MR. WOLF:  Why don't we take five?
19      MR. ALLEN:  Sure.
20      (Wherein, a brief recess was taken.)
21      MR. WOLF:  No further questions.
22      MR. ALLEN:  I have a couple questions.
23          EXAMINATION
24  QUESTIONS BY MR. ALLEN:
25  Q.  Mr. Maritz, a few minutes ago Mr. Wolf

Page 88

1  asked you if there was any misconduct that played a
2  role in Mr. Carter's termination.  Do you recall
3  that question?
4  A.  I do.
5  Q.  And when you answered that question,
6  were you referring, specifically, to the decision to
7  separate with Drew Carter from the company on
8  August 20?
9  A.  I was.
10  Q.  Are you aware of any instances, after
11  August 20 -- strike that.
12      When Mr. Carter was informed of his
13  termination on August 20, was he provided with a
14  date certain upon which he would be leaving the
15  company?
16  A.  I don't remember exactly.
17  Q.  Okay.  Do you recall if his termination
18  was accelerated in any way prior to the date upon
19  which he was planning to leave the company?
20  A.  It was by a bit.
21  Q.  And do you recall what the
22  circumstances were that led to that decision?
23  A.  Well, I recall there were, you know,
24  allegations of him fiddling around where he
25  shouldn't have been, and I knew about communicating

### Page 97

1  Q. Do you recall generally what he said?
2  A. Indicated he hadn't spoken to her about
3  the opportunity.
4  Q. When Mr. Gallant informed you that --
5  strike that.
6      When Mr. Gallant informed you of his
7  belief that Mr. Carter had, in fact, spoken to
8  Ms. Wiseman, what did you do?
9  A. I listened.
10 Q. Did you talk to Mr. Carter subsequent
11 to that?
12 A. I'm sure I did.
13 Q. What do you recall from that
14 discussion?
15 A. Well, I don't know that the discussion
16 was about that.
17 Q. Did you talk to Mr. Carter about his
18 conversations with Ms. Wiseman?
19 A. No.
20 Q. Why not?
21 A. There was no need.
22 Q. Why was there no need?
23 A. Well, because the decision would
24 already largely have been taken to not do NewCo.
25 Q. And to terminate Mr. Carter?

### Page 98

1  A. Yes. I mean, it was part and parcel.
2  Q. With the NewCo decision?
3  A. Yeah.
4      MR. WOLF: Nothing further.
5      MR. ALLEN: Nothing.
6      THE REPORTER: Signature?
7      MR. ALLEN: Yes, please.
8      (Wherein, the deposition ended at
9  10:50 a.m.)

### Page 99

1  NOTARIAL CERTIFICATE
2
3      I, DEANNE M. RENKEN, a Registered
4  Professional Reporter, Certified Shorthand Reporter
5  (IL), and Certified Court Reporter (MO) and (AR), do
6  hereby certify that the witness whose testimony
7  appears in the foregoing deposition was duly sworn
8  by me; that the testimony of said witness was taken
9  by me to the best of my ability and thereafter
10 reduced to typewriting under my direction; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this
13 deposition was taken, and further that I am not a
14 relative or employee of any attorney or counsel
15 employed by the parties thereto, nor financially or
16 otherwise interested in the outcome of this action.
17
18
19      DeAnne M. Renken
20      Illinois CSR #084-004441
21      Missouri CCR #806
22      Arkansas CCR #828

### Page 100

1  ALARIS LITIGATION SERVICES
2
3  June 22, 2021
4
5  Mr. Justin A. Allen
   OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
   111 Monument Circle
6  Suite 4600
   Indianapolis, Indiana  46204
7
8  IN RE: MARITZ HOLDINGS INC. and MARITZ MOTIVATION
       INC. v. DREW CARTER, et al.
9  Dear Mr. Allen:
10 Please find enclosed your copies of the deposition of
   WILLIAM STEPHEN MARITZ taken on June 17, 2021 in the
11 above-referenced case. Also enclosed is the original
   signature page and errata sheets.
12
   Please have the witness read your copy of the
13 transcript, indicate any changes and/or corrections
   desired on the errata sheets, and sign the signature
14 page before a notary public.
15
16 Please return the errata sheets and notarized
17 signature page within 30 days to our office at 711 N
18 11th Street, St. Louis, MO 63101 for filing.
19
20 Sincerely,
21
22
23 DEANNE M. RENKEN
24
25 Enclosures



From: **Drew Carter** drewcarter@yahoo.com
Subject: Fwd: Good catching up
Date: December 11, 2020 at 3:28 PM
To:

Drew Carter
+1.646.469.6758
drewcarter@yahoo.com

> Begin forwarded message:
>
> From: "Maritz, Steve" <Steve.Maritz@maritz.com>
> Subject: **Re: Good catching up**
> Date: November 12, 2020 at 1:26:44 PM CST
> To: d x <drewcarter@yahoo.com>
>
> Ani's Drew- it was good to see you. I let Steve know about these activities...I don't foresee any problems.
> Good luck, and stay in touch
>
> Get Outlook for iOS
>
> ---
>
> **From:** drewcarter@yahoo.com <drewcarter@yahoo.com>
> **Sent:** Tuesday, November 3, 2020 2:31:58 PM
> **To:** Maritz, Steve <Steve.Maritz@maritz.com>
> **Subject:** Good catching up
>
> *** EXTERNAL EMAIL: Do not click links or attachments unless you recognize the sender. ***
>
> Steve,
>
> Thanks for making the time to connect with me last week. I'm glad to hear MGE is staying busy! I'll keep funneling as much business to them as I can.
>
> As I mentioned, I'm starting a new software / financial technology company. Chris Dornfeld, Laurel Newman and Jesse Wolfersberger asked to join, so we've teamed up. We are tackling the financial payment processes for incentive program payments. The company will not compete with Maritz but rather disrupt the market space for companies like Blackhawk Network, Davinci, Incomm, FIS and FiServ occupy. These companies take about 650 basis points of value from each payment transaction, wasting it on intermediary processes. We are building out the financial payment systems (including all the regulatory infrastructure) to deliver payments directly to end users, bypassing those intermediaries completely. We are focusing on companies with $10 million to $999 million in revenue who want self-service. We don't have any services, so our overhead is very low. If all works out, we will create a new Fin-Tech company in St Louis and follow the lead of Maritz in adding to the richness of our community.
>
> I want to reiterate my affection for you and all of Maritz and thank you for your encouragement and well wishes in my new business venture. Your company is a great hallmark of St. Louis and I want the best for everyone there. I also want to steer clear of anything that might cause me to get sideways with you or anyone else at Maritz. Please let me know if I can do anything to help Maritz. I'm here for you.
>
> Regards,
> Drew
>
> Confidentiality Warning: This e-mail contains information intended only for the use of the individual or entity named above. If the reader of this e-mail is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, any dissemination, publication or copying of this e-mail is strictly prohibited.

DEFENDANT'S EXHIBIT 23 DR 6-17-21    DEF000892

The sender does not accept any responsibility for any loss, disruption or damage to your data or computer system that may occur while using data contained in, or transmitted with, this e-mail. If you have received this e-mail in error, please immediately notify us by return e-mail. Thank you.

DEF000893