**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| MARITZ HOLDINGS INC., et al, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) Case No. 4:21-cv-00438 |
| DREW CARTER, et al, | ) ) ) |
| Defendants. | ) ) |

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

With limited citation to supporting legal authority, the Defendants take a scattershot approach to opposing Maritz's request for injunctive relief. (*See* Doc. #71 ("Resp. Br.").) Notably absent from the Defendants' brief is any denial that: (1) they stole Maritz's property and information; (2) Maritz sent several pre-litigation letters demanding the identification of all Maritz documents in the Defendants' possession so it could be returned; and (3) the Defendants refused to disclose their misappropriation or make any effort to return Maritz's property, thereby necessitating this lawsuit. Now, after months of costly and time-consuming litigation, the Defendants made a belated (but conveniently-timed) offer to return Maritz's confidential information and trade secrets on the eve of their briefing, arguing this offer obviates the need for an injunction. The Defendants are wrong, and they should be enjoined to protect Maritz from the ongoing threat of irreparable harm.

**I.   Maritz has a likelihood of success on the merits of its trade secret claims.**

   **A.   This is not a case of "mere possession" of trade secrets; the Defendants committed an intentional and coordinated theft of Maritz's property.**

To try to minimize the severity of their misconduct, the Defendants portray this as a case of mere "possession" of Maritz documents. (*See e.g.*, Resp. Br. at p. 2 ("Maritz's request for broad injunctive relief is based solely on Defendants' possession of Maritz documents[.]"), p. 20

(describing the Defendants' "Mere Continued Possession of Purported 'Trade Secrets'" as being insufficient to justify an injunction).) But this is not a situation where an employee inadvertently held on to a few company documents post-employment. Rather, as detailed at length in Maritz's opening brief, the Defendants engaged in a coordinated effort to steal Maritz's property, including: (1) Carter attempting to export his entire Maritz inbox/outbox as a .pst file; (2) Carter forwarding several highly-confidential Maritz documents, including client proposals and project updates, to his personal email account; and (3) Hrdlicka, Valenti, and Conwell harvesting Maritz's source code and schema files before resigning from Maritz, including uploading these files to cloud storage accounts and taking surreptitious photographs of them. (PI Br. at p. 7–12.)

But that's not all. Since Maritz filed its initial brief, the Court-appointed Forensic Neutral's investigation has revealed even *more* evidence of willful and malicious theft by the Defendants:

1. Drew Carter *did* successfully create a backup of some or all of his Maritz email account. He did so on August 20, 2020 (the same day he learned of his termination), using his Maritz-issued MacBook laptop to create a ".olm file," which he then saved to his personal cloud storage account. (Excerpts of Second Depo. of Drew Carter, **Exhibit 26** at 6:22–15.) Carter admitted he took these documents to pursue a potential future "business opportunity," and he did so without Maritz's knowledge or permission. (*Id.* at 8:16–9:23.)

2. Andrew Hrdlicka uploaded massive amounts of Maritz information (including schema files) to a folder entitled "The Best of Atlas" on his personal Dropbox cloud storage account. (Excerpts of Second Depo. of Andrew Hrdlicka, **Exhibit 27** at 4:23–6:1.) He admitted the documents he stole included some of the "most important" things he worked on at Maritz, and he did so because he thought they might have value to him in the future. (*Id.* at 7:4–25.)

In short, the evidence of the Defendants' misappropriation is overwhelming, and the volume of information taken by them is immense. This is not a case of innocent or inadvertent "mere continued possession."

### B. The documents at issue include trade secrets.

The Defendants argue that what they stole from Maritz does not qualify as trade secrets, focusing on Maritz's database schema and the customer proposals and program information forwarded by Carter to his personal email account. The Defendants are wrong on both points.

#### i. The database schema qualifies as a trade secret.

The Defendants mischaracterize the deposition testimony of Maritz's VP of Engineering, Steve Thurston, to argue Maritz's database schema is not a protectable trade secret. For example, the Defendants claim Mr. Thurston "testified that he is unaware of anything about Maritz's schema that is unique among its competitors" (Resp. Br. at p. 19.) But this testimony is hardly surprising given that Mr. Thurston could not identify what Maritz's competitors' schema looks like ***because the information is kept secret***. (Thurston Depo., Defs' Ex. F at 109:6–18 ("I don't know what their schema looks like. It's a very difficult question. You're asking me to know something about them that they wouldn't share with me, just like I wouldn't share with them.").) The Defendants go on to claim that Thurston "was able to come up with the elements of a 'user table,'" but his generic, high-level testimony about the basics of Maritz's database is entirely different than knowing how to write the schema itself. (*Id.* at 103:16–21 ("Q: What kind of fields related to a person would be in the schema?" A: "The date they entered a program or the date you found – you learned about them. Like an origination date, name, possibly address, things like that.").) Mr. Thurston's testimony is in no way evidence that the specific contents of Maritz's schema are "reasonably ascertainable through proper means by others," as the Defendants argue. (Resp. Br. at p. 19.)

The Defendants are wrong on the law, as well. That some generic information about a trade secret may be gleaned "through proper means by others" does not destroy its protection. *See e.g.*, *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1237 (8th Cir. 1994)

("Many courts have held that the fact that one 'could' have obtained a trade secret lawfully is not a defense if one does not actually use proper means to acquire the information.") (collecting cases). Nor does information need to be entirely "novel" or "unique" to be a trade secret, as the Defendants suggest. *See e.g.*, *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972–73 (8th Cir. 2011) ("[E]xistence of a trade secret is determined by the value of a secret, not the merit of its technical improvements. Unlike patent law, which predicates protection on novelty and nonobviousness, trade secret laws are meant to govern commercial ethics.") (collecting cases).

The enormous time, money, and resources Maritz has devoted to curating its specific database schema is protectable under the DTSA and MUTSA, irrespective of whether another person could describe (or even recreate) some aspects of the schema. That is exactly why multiple courts have found that database schema is a protectable trade secret in a variety of contexts. *See e.g.*, *Versata Software, Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841, 851–52 (E.D. Tex. 2012) (affirming jury verdict finding trade secret misappropriation based on database schema); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77–80 (D.D.C. 2007) (finding that plaintiff sufficiently alleged trade secret misappropriation based on theft of database schema); *Disney Enters. v. Hotfile Corp.*, Case No. 11-20427-CIV-JORDAN, 2011 U.S. Dist. LEXIS 160488, at *9 (S.D. Fla. Sept. 14, 2011) (finding that schema was a trade secret because "[i]t took thousands of man-hours to code the schema and years to refine it" and "anyone with access to the schema would have automatic access to all that labor"). The schema is protectable trade-secret information.

        ii.     <u>The documents taken by Carter include trade secrets.</u>

Carter forwarded several business proposals (including pricing information, project timetables, and details on customer needs) and project plans to his personal email account.[1] (*See*

---

[1] On July 8, 2021, Maritz received evidence from the Forensic Neutral showing that Carter misappropriated a number of additional documents (including many more client proposals and pricing worksheets) by

4

Ex. 4 at *Exhibits 14*, *15*, and *16* thereto.)  These documents are protectable trade secrets.  *See e.g.*, *Advanced Control Tech. v. Iversen*, Civil No. 19-1608(DSD/TNL), 2021 U.S. Dist. LEXIS 124624, at *11 (D. Minn. Apr. 8, 2021) ("[Plaintiff] has developed valid trade secrets that are at issue here, including . . . current competitive pricing and pricing strategy, customer quotes, active company operations . . . and product specifications and drawings."); *Mattern & Assocs., L.L.C. v. Seidel*, 678 F. Supp. 2d 256, 269 (D. Del. Jan. 14, 2010) (finding that trade secrets included "client proposals, requests for proposal, [and] client requirements").

The Defendants argue that because certain documents "were intended to be sent to the client," they are "not a 'secret.'"  (Resp. Br. at p. 20.)  Tellingly, the Defendants cite no cases for this argument.  Sharing a document ***specifically prepared*** for a particular client with that client—and only that client—does not destroy the secrecy of a trade secret document.

Nor are the documents "stale."  In *Victoria's Secret Stores, Inc. v. May Dept. Stores Co.*, the appellate court found that the trial court did not err in concluding that seasonal business plans and weekly and monthly sales reports were not trade secrets.  157 S.W.3d 256, 263 (Mo. Ct. App. 2004).  As an initial matter, the *Victoria's Secret* case did not establish any bright-line rule; it simply found that the trial court could have reasonably concluded the documents had "a limited useful life," and therefore affirmed the finding.  *Id.*  The documents in that case are distinguishable from the documents at-issue here: Maritz's customer contracts last for years—far longer than a weekly, monthly, or even seasonal period—and the proposals have value beyond that.  These documents therefore also qualify as trade secrets.

---

uploading them to a personal cloud storage account.  Due to the confidential and sensitive nature of these documents, they are not included here, but will be included as potential exhibits at the hearing.

5

**C.     Maritz's efforts to protect its trade secrets *far* exceed the kinds of efforts that courts regularly find reasonable.**

Again without citation to a single case in support, the Defendants next argue that Maritz "does not take reasonable measures to protect and keep the information secret." (Resp. Br. at p. 17.) The Defendants' argument is inconsistent with DTSA and MUTSA case law on this element.

"Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required." *AvidAir*, 663 F.3d at 974. "Companies need not 'guard against the unanticipated, the undetectable, or the unpreventable methods of espionage now available' or create 'an impenetrable fortress.'" *Pioneer Hi-Bred*, 35 F.3d at 1236. In other words, "the standard is reasonableness, not perfection." *TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 30 (D. Mass. 2004).

"Relevant precautions to maintain secrecy include 'physical security designed to prevent unauthorized access, procedures intended to limit disclosure based upon the need to know, and measures that emphasize to recipients the confidential nature of the information such as nondisclosure agreements, signs, and restrictive legends." *Smithfield Packaged Meats Sales Corp. v. Dietz & Watson, Inc.*, 452 F. Supp. 3d 843, 857 (S.D. Iowa 2020). *See also*, *Sigma Chem. Co. v. Harris*, 605 F. Supp. 1253, 1256 (8th Cir. 1986) (finding "reasonable measures" where plaintiff employed armed guards, used identification badges, required visitors to be accompanied by security, and limited employee access to files). Maritz utilizes some version of all of these measures, including: on-site security; limiting file access to certain employees; information security policies and protocols; password-protected computers and systems; confidentiality

agreements; and designations to alert employees as to the confidential and proprietary nature of certain documents.  (*See* PI Br. at p. 3–4 (citing Ex. 5 at Interrogatory No. 4).)[2]

The Defendants' arguments simply ignore the vast majority of these protective measures, as well as the relevant case law.  Maritz's efforts to safeguard its trade secrets go well beyond what courts find reasonable to establish trade secret protection.

## II. Maritz has a likelihood of success on its contract claims.

### A. The Agreements are reasonable and enforceable.

While the Defendants argue the Agreements at issue in this case are "patently" overbroad, they are actually well within the limits set by Missouri lawmakers and courts in length and scope.

First, the Defendants wrongly contend "Maritz's confidentiality provision is unenforceable because it is unlimited in its temporal scope." (Resp. Br. at p. 12.)  But the Eighth Circuit has made clear that provisions requiring employees to maintain confidentiality of company information need not contain a time limitation.  In *Synergistics v. Hurst*, the Eighth Circuit (applying Missouri law) found no authority for the notion "that confidentiality agreements must contain time and geographic limitations to be valid."  477 F.3d 949, 959 (8th Cir. 2007).  The *Synergistics* court emphasized the distinction between confidentiality agreements and restrictive covenants; while the latter "must be reasonable as to time and space," the same is not true with

---

[2] The Defendants wrongly argue that Maritz marks "virtually every document created at Maritz" as "confidential and proprietary," but that is not true. (Resp. Br. at p. 18.) Maritz's corporate witness testified that ***not*** every Maritz document contains this designation; rather, he testified that he "believe[s] that most of our templates have this footer in them" and "[i]t is in our templates because we believe that the information that we produce, whether it be internal or external, is proprietary and confidential to Maritz, and it is to alert people to that very fact so that they do not take our information when they leave our employ." (Maritz Motivation Depo., Defs' Ex. C at 102:6–103:12.) Notably, Whistle does the ***exact same thing***; it is "standard practice" for Whistle to designate its company materials as "Proprietary and Confidential."  In any event, this argument is a red herring, as the Defendants fail to cite any authority for their dubious contention that marking ***too many*** documents as "confidential and proprietary" somehow destroys their protection.

7

respect to confidentiality agreements.  *Id.* at 958–59.  Thus, an employer may prohibit its current and former employees from the unauthorized use or disclosure of its property into perpetuity.

The Defendants further argue that the Confidentiality and Return of Property Provision is unenforceable for being substantively overbroad.[3]  This is facially untrue, as the Agreement is tailored to protect the key information used in Maritz's business operations.  And in any event, the documents and information stolen by the Defendants—source code, schema, business proposals, project updates, etc.—constitute "confidential information" under any plausible definition.

Defendants also argue (again without authority) that the Employee Non-Solicit is "hopelessly overbroad." (Resp. Br. at p. 14.)  The Missouri Legislature and Missouri courts beg to differ.  By statute, a covenant not to "solicit, recruit, hire or otherwise interfere with the employment of one or more employees ***shall be enforceable*** and not a restraint of trade . . . (4) so long as such covenant does not continue for more than one year following the employee's employment."  Mo. Rev. Stat. § 431.202(4) (emphasis added).  This is true even in the absence of other protectable interests.  *Id.*  Thus, employee non-solicitation provisions like Maritz's here are "per se reasonable" and enforceable if they are only one year in length.  *See Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 845-46 (Mo. banc. 2012).

Finally, even if some portion(s) of these provisions are overbroad (and they are not), they may be reformed and enforced to the extent they are reasonable.  The Defendants note this reformation remedy is "optional." (Resp. Br. at p. 12.)  However, reformation is commonly used by Missouri courts in similar circumstances.  *See e.g.*, *Mid-States Paint & Chem. Co. v. Herr*, 746 S.W.2d 613, 616 (Mo. Ct. App. 1988) ("[A]n unreasonable restriction against competition in a

---

[3] The Defendants fail to cite any case in support of their contention that this provision is substantively overbroad or unreasonable, and the undersigned's research into Missouri and Eighth Circuit case law revealed none, either.  In other words, finding the Confidentiality and Return of Property Provision unenforceable would be a significant departure from existing precedent.

contract may be modified and enforced to the extent that it is reasonable, regardless of the covenant's form of wording."); *Parameter, LLC v. Poole*, Case No. 4:19-cv-02743-AGF, 2019 U.S. Dist. LEXIS 211459, at *28–29 (E.D. Mo. Dec. 9, 2019) (narrowing geographic scope of non-compete).  Given the facts and circumstances of this case, the Court would be well within its discretion to reform any of the contract terms at issue, if necessary to make them enforceable.[4]

**B.      The Defendants have breached the Agreements.**

i.      <u>The Defendants are competing with Maritz.</u>

The Defendants wrongly contend that Maritz admits "Whistle is not competing with it." (Resp. Br. at p. 14.)  Maritz has made no such admission.  Rather, Maritz admits—based solely on the Defendants' own testimony—that Whistle does not yet have any *customers* in the channel sales incentives industry.  (PI Br. at p. 23 ("Whistle does not currently have any actual or prospective customers for its marketed channel sales incentives programming services; rather, all of its current and potential business falls in the areas of data reporting and learning management, not channel incentives.").[5]  The Defendants apparently believe that so long as they do not *yet* have any customers in the channel sales incentives space, they are not "competing" with Maritz.  This exceedingly narrow interpretation of "competition" has no support in the law and is belied by Whistle's own affirmative representations on its website and to its investors, which make repeated express and implied references to Maritz as a company in the channel sales incentives marketplace.

---

[4] The Defendants' brief makes no argument that the Non-Compete Provision is unreasonable, so Maritz does not address it at length here.  However, as noted in Maritz's opening brief, the Non-Compete Provision is reasonable, and it may be reformed, in any event.  (PI Br. at p. 20–21.)

[5] Maritz made note of this fact to show that Whistle could easily pivot away from the channel sales incentives space and focus its efforts on the other lines of business it purports to offer.  As such, there is little-to-no harm in enjoining the Defendants from competing in this niche space.

     ii.  The Defendants violated the Confidentiality and Return of Property Provision.

  The Defendants make the incredible contention that they did not breach the Confidentiality and Return of Property Provision. (Resp. Br. at p. 15–16.) By entering into the Agreement, each Individual Defendant assumed the responsibility to "return any and all Confidential Information . . . to Maritz on or prior to the termination of your employment (for any reason whatsoever) and not keep any copies (in whole or in part), notes, or other documentation of such information."

  All of the Individual Defendants violated this obligation—indeed, they readily admitted doing so at their depositions. (*See* PI Br. at p. 21 (and depositions cited therein).) And it is beyond question that this responsibility was the Defendants' alone; the parties contracted on this issue, and the unambiguous text of the contract controls. *See State ex rel. Nixon v. Alternate Fuels, Inc.*, 158 S.W.3d 811, 813 (Mo. Ct. App. 2005) ("If contract terms are clear and unequivocal, the court is bound to enforce the contract as written."). The Defendants' attempt to impose an obligation on Maritz to affirmatively seek out the return of all of its stolen documents is contrary to foundational principles of contract law.

  In any event, the Defendants ignore that Maritz *did* try to secure the return of its property before filing suit, and the Defendants refused. First, Maritz wrote to Carter on August 31, 2020, seeking his compliance with his Agreement and the return of all Maritz Confidential Information:

> Please immediately return all Maritz property in your possession, custody, or control, including but not limited to: your laptop computer, your cell phone; any flash drive, CD, floppy disk, or other removal storage media devices which belong to the company or which contain Maritz information (or its customers' information); any hard-copy documents which belong to the company or which contain Maritz information (or its customers' information); and any other documents or information defined as "Confidential Information" under the Agreement.

(August 31, 2020 Ltr. from S. Gallant to D. Carter, **Exhibit 28**.) In response to this letter, Carter refused to return (or even disclose) the documents he stole from Maritz In fact, just days after

receiving this letter, Carter *continued* to steal, uploading Maritz documents to his personal cloud storage account between September 1–3, 2020. (Excerpts of Report of Garrett Discovery, **Exhibit 29**; *see* "Server Last Modified" and "Client Modified Date/Time" entries.)[6]

Months later, in April 2020, Maritz explicitly asked each Individual Defendant to certify whether they had any documents bearing Maritz confidential or trade secret information in their possession, and if so, to provide an accounting of all such documents. (*See* Ex. 23.) In response, *none* of the Defendants came clean; instead, they continued to conceal the Maritz Confidential Information in their possession (much of which was intentionally taken), forcing Maritz to file this costly and time-consuming lawsuit.

In short, the Defendants clearly breached the Confidentiality and Return of Property Provision, despite multiple opportunities to comply.

### iii. The Defendants solicited Maritz employees.

Hrdlicka and Valenti were solicited to Whistle by Carter, who explicitly invited them (and other Maritz employees) to his home on August 22, 2020, for the purpose of discussing future business plans. (*See* PI Br. at p. 7, and exhibits cited therein.) Conwell, meanwhile, was not a part of the initial Whistle team, but was solicited to join the company on or around September 15, 2020, during a meeting at Carter's home. (Add'l Excerpts of Depo. of Daniel Conwell, **Exhibit 30** at 36:2–37:12.) All three of these employees—Hrdlicka, Valenti, and Conwell—voluntarily resigned from Maritz. These recruiting efforts represent a breach of the Employee Non-Solicit.

---

[6] Due to the voluminous nature of this report, Maritz is including only an excerpt of its contents to show Carter's uploading of documents to his Dropbox account. The uploads from September 1–3, 2020 span hundreds of entries in the report.

11

**III.     Maritz faces irreparable harm and is entitled to injunctive relief.**

Maritz may be left without a remedy if injunctive relief is denied, as damages will be nearly impossible to quantify. Eighth Circuit courts have recognized for decades that irreparable harm is nearly always present in cases involving misappropriation of trade secrets, breaches of confidentiality agreements, and violations of restrictive covenants—precisely because of the difficulty of calculating damages in such cases. *See e.g.*, *Ronnoco Coffee LLC v. Peoples*, Case No. 4:20-CV-1401 RLW, 2020 U.S. Dist. LEXIS 218661, at *20 (E.D. Mo. Nov. 23, 2020) ("[T]he irreparable harm to [plaintiff] may include not only the disclosure of confidential information and trade secrets . . . but also the violation of a binding non-competition agreement designed to protect [plaintiff's] interests. As such, its remedy at law is inadequate because its damage would be difficult if not impossible to measure."); *Wyeth v. Natural Biologics, Inc.*, Civ. No. 98-2469 (JNE/JGL), 2003 U.S. Dist. LEXIS 17713, at *71 (D. Minn. Oct. 2, 2003) ("Misappropriation of a trade secret constitutes irreparable harm warranting injunctive relief."); *Uncle B's Bakery v. O'Rourke*, 920 F. Supp. 1405, 1434–35 (D. Iowa 1996) (finding irreparable harm based on misappropriation of trade secrets and violations of restrictive covenants agreements, even where new employer affirmatively promised it would not utilize the plaintiff's confidential information or trade secrets). In other words, while preliminary injunctive relief is not "automatic" (and Maritz has never argued that it is), denial of such relief is the exception, not the norm.

In response to this body of case law, the Defendants rely on an inapposite case—*Novus Franchising, Inc. v. Dawson*, 725 F.3d 885 (8th Cir. 2013)—to argue Maritz failed to demonstrate irreparable harm. In *Novus*, a franchisor of automotive glass repair businesses terminated a franchisee after he failed to pay royalties. *Id.* at 889. When the former franchisee continued selling under the franchisor's brand without authorization for another 17 months, the plaintiff sued for (among other things) injunctive relief. *Id.* The district court granted a preliminary injunction to

12

prohibit the defendant from using plaintiff's marks and products, but refused to enjoin the defendant from operating his business altogether, finding that plaintiff would not suffer irreparable harm if he did so. *Id.* at 890. The Eighth Circuit affirmed, finding the district court did not abuse its discretion in not enforcing the broader non-compete. *Id.* The Defendants' reliance in *Novus*—a case with vastly different facts and dissimilar equitable considerations—does little to help its case here.

The Defendants argument also ignores that they are in ongoing possession of massive volumes of Maritz confidential information right now, information which was stolen with malicious intent. The Defendants contend (without citation to record evidence) that they offered to delete Maritz's information, which Maritz "refused." (Resp. Br. at p. 2.) To be clear, Maritz has never declined this offer, which was first made on June 29, 2021. (R. Wolf Email to J. Allen, **Exhibit 31**.) Rather, Maritz is following the recommendations of the Forensic Neutral, who suggested to complete the forensic investigation before proceeding with a remediation plan. Because the forensic investigation is ongoing, deletion of evidence would be premature. Nor would the voluntary return and deletion of documents be sufficient, in any event; that ship has long since sailed. Maritz is entitled to a Court order—backed by threat of contempt for non-compliance—barring the Defendants from any further possession, use, or disclosure of its trade secrets. Notably, the DTSA permits this Court to issue injunctive relief to prevent not only actual misappropriation, but ***threatened*** misappropriation, as well. *See* 18 U.S.C. § 1836(b)(3)(A)(i). The threat to Maritz is ongoing, and the Defendants' belated offer to return or delete trade secrets and confidential information does not obviate the need for an injunction.

The Court should therefore issue injunctive relief to require the return of all Maritz trade secrets and Confidential Information and ensure the Defendants are not in a position to make

13

beneficial use of previously-incorporated information or any undisclosed copies of Maritz's trade secrets.

Respectfully submitted,

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

*/s/ Justin A. Allen*
Gregg M. Lemley, MO #44464
Daniel P. O'Meara, PA #53535 (*pro hac vice*)
Justin A. Allen, IN #3120449 (*pro hac vice*)
Bradley W. Tharpe, MO #71203
7700 Bonhomme Ave, Suite 650
St. Louis, MO 63105
Tel: (314) 802-3935
Fax: (314) 802-3936
gregg.lemley@ogletree.com
dan.omeara@ogletree.com
justin.allen@ogletree.com
brad.tharpe@ogletree.com

*Attorneys for Plaintiffs*

## **CERIFICATE OF SERVICE**

I hereby certify that on July 13, 2021, the foregoing was filed through the Court's ECF/CM system which made service on all registered participants.

*/s/ Justin A. Allen*

47816884.1

14